————o————

The County Court of St. Louis County, Appellant, *vs.* William D. Griswold, *et al.*, Respondents.

1. *When courts may declare acts of legislature void.*—The courts cannot declare an act of the legislature void, no matter how unjust or impolitic it may be, unless it clearly conflicts with specific provisions of the constitution.

2. *Taking private property for public use—Power of the courts to restrain the legislature.*—The courts have power to determine whether the use for which private property, authorized by the legislature to be taken, is in fact, a public use, but if this question is decided in the affirmative, the judicial function is exhausted; the extent to which such property shall be taken for such use, rests wholly in the legislative discretion, subject only to the restraint that just compensation must be made.

3. ——. *A park for the inhabitants of a county is a public use.*—The legislature of Missouri, authorized the appropriation of land for a public park for the benefit of the inhabitants of St. Louis county, located in the eastern portion of said county, near to, and outside of, the corporate limits of the city of St. Louis: *Held*, that this was a "public use," notwithstanding the fact that it would be chiefly beneficial to the inhabitants of the city, and that the act was not unconstitutional.

4. *Municipal indebtedness—Constitutional ordinance construed.*—That clause of the constitution of Missouri (Art. 11, § 14) which prohibits the general assembly from authorizing any county, city or town to become a stockholder in, or to loan its credit to any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a regular or special election to be held therein, shall assent thereto—does not prohibit the legislature from authorizing a county to create a debt for the purpose of establishing a public park for the benefit of its inhabitants.

5. *Power of legislature to establish board of park commissioners.*—The legislature of Missouri has power to establish a board of park commissioners, one-half to be appointed by the county court, and one-half by the circuit court of the county, for the purpose of constructing and managing a park for the benefit of the inhabitants of the county

6. *Taking private property for public use—Legislature may not arbitrarily fix value—Acts valid in part and void in part.*—An act authorizing private property to be appropriated for the establishment 'of a public park, contained a proviso, "that in all cases, the assessment of the county assessor for the year 1873, shall be taken as a guide in fixing the value of the property to be condemned or appraised:" *Held,* that if it was intended by this proviso, that the assessment made in 1873, should be taken as the measure or standard in fixing the value for compensation, then it would be clearly unconstitutional and void. "Property can only be taken or appropriated upon making just compensation. What is just is a matter of inquiry, ascertainable by either appraisers or a jury, upon evidence furnished in the case. No law can arbitrarily fix a value on property, and tell the owner he shall take that." But since an act may be valid in part and void in part, and since if this proviso were eliminated, there would still be adequate provisions in the act for its enforcement, *Held* also, that it may be rejected and the remaining portions of the act permitted to stand.

7. *Taking land for a public park—Vesting title in the "People of the County."*—An act of the legislature providing that the title to land condemned for a public park shall vest in the "people of the county," is not void from the fact that the "people of the county" do not constitute any recognized legal or political body. The terms "people of the county," and "the county," may be regarded as interchangeable.*

## *Thomas C. Reynolds,* for Appellant.

I. As to the park's being of "public use". The whole attempt of respondents' counsel as to this point, is to prove by their own assertions and reasoning, that this law is unjust and oppressive upon a portion of the people of the county and that should it be sanctioned, other similar laws may hereafter be passed. There is no pretense, nor the slightest allusion made in their long argument on this point, to the violation of any specific provision of the constitution. But there is no power in the court to remedy injustice or oppression in a legislative body unless some constitutional provision is violated. (Hamilton vs. St. Louis County, 15 Mo., 3 ; State vs. State Line Railroad, 48 Mo., 471 ; Cooley Con. Lim., pp. 159, 162, 167, 2 Ed.) It necessarily follows that this court must clearly see that the act manifestly conflicts with some "specific provision of the constitution" before it has any authority to declare it void, however unjust or oppressive it may be.

---

*I acknowledge myself indebted for this syllabus to the Central Law Journal, Jan., 1875.—Reporter.

"The necessity for appropriating private property for the use of the public, or of the government is not a judicial question. * * * The necessity of taking private property for public use is to be determined by the legislature, and it may, by statute, directly and at once, designate the property to be appropriated, and the purpose of the appropriation, or delegate the power to officers or corporations." (People vs. Smith, 21 N. Y., 597; Vareigne vs. Fox, 2 Blatchf., 95 ; Dickey vs. Tennison, 27 Mo., 376; Township Board vs. Hackmann, 48 Mo., 245 ; Cool. Con. Lim., 537; *Id.*, 530, Title "Purpose.")

The right of eminent domain is not conferred by the constitution. It exists as a necessary attribute of sovereignty in every government. (Cool. Con. Lim., 424, and note 1 and authorities there cited ; Bonaparte vs. Camden & Amboy R. R., Bald., 205 ; Barringer vs. Edman, 14 Har. [Pa.] 129 ; E. St. Louis vs. St. John, 47 Ill. 463.)

The constitutional provisions confining the exercise of the right to a public use, and upon paying compensation, are restrictions upon the right.

We are, therefore, to see whether there is any express provision of the constitution which restricts and forbids the legislature to authorize counties to establish public parks when, in the judgment of the general assembly, the number of people in the county, that is, the whole county, renders it useful or beneficial to the people thereof, and as it is not pretended there is any such restriction, the power exists.

"The incompatibility must not be speculative, argumentative, or to be found only in hypothetical cases or supposed consequences. It must be clear, decided and inevitable, such as presents a contradiction at once to the mind, without straining either by forced meanings or consequences too remote. It is the constitution that must be violated, and not any man's opinions of right or wrong, or his principles of natural justice. These are uncertain standards of legislative power, and must be referred to the discretion of those to whom the people have given that power, and to whom they must answer for an

12—VOL. LVIII.

abuse of it." (Livingstone vs. Moore, 7 Pet., 663, 4; Brooklyn Park vs. Armstrong, 45 N. Y., 236; Owners vs. Albany, 15 Weed, 376–7.)

The legislature and the governor, by establishing Forest Park for the people of St. Louis county, decided that it was of "public use" to the whole people of the county, as a body; and this decision of the two other branches of the State government is not subject to review by the third co-ordinate branch, the judiciary.

Even were it subject to such review, the facts, of which the court will take judicial notice without testimony of witnesses, clearly establish that that park is of public use, beneficial to the whole people of that county.

II. The Forest Park act is not contrary to section 14 of article XI. of the State constitution, which says that "the general assembly shall not authorize any county, city or town to become a stockholder in, or to loan its credit to, any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a regular or special election to be held therein, shall assent thereto."

The first question to be considered, is whether that board is a company, association or corporation.

Three of its members are nominated by the County Court, and confirmed by the Circuit Court; three are nominated by the Mayor of the city of St. Louis, and confirmed by its City Council; and the seventh is the presiding justice, for the time being, of the County Court. Thus a majority of the board is dependent for appointment on the County Court, or (in the case of its presiding justice) on the direct choice of the voters of the county; and the minority is appointed by the Mayor of the City of St. Louis, which contains nine-tenths of the population of the county.

The board of Forest Park commissioners is destitute of every ear-mark denoting a company, association or corporation. It has no perpetual succession, but may, at any time, be abolished by the legislature. It possesses no property and holds no money; for the park itself belongs to the people

of the county, even the possession of it remains with the County Court, (§ 3 of act) and all park moneys are to be deposited with the county treasurer. (§ 6 of act.) They cannot touch a cent of those moneys without the approval of the County Court, and they must semi-annually report all their proceedings to that body. The act does not give them even a power "to sue and be sued," an indispensable attribute of every company, association or corporation, as distinguished from officers, agents or employees of the government. In the act, the legislature evidently does not regard the board as a corporation, for there is not the slightest provision that, before it may act, it must be duly organized under the general corporation law.

III. The opposing counsel contend that the park act is unconstitutional, because it provides for taking private property, not at its just value, but solely at the valuation placed on it in the tax assessment of 1873.

The words of the act : "In all cases, the assessment of the county assessor for the year 1873, shall be taken as a guide in fixing the value of property to be condemned or appraised," simply mean that the assessment was to be taken as one guide, or some guide, but not as the only or conclusive guide.

This construction is still clearer, from an examination of the whole act. The appointment of appraisers, who are to be sworn to fix the value of the property themselves ; the provisions, that either party might require a jury in lieu of the appraisers, that the owner might move the court to exercise its discretion in setting aside the appraisement or verdict, prove beyond cavil that the assessment was not to be the conclusive and only guide.

But even were the act susceptible of the forced construction put upon it by the opposing counsel, the only result would be that so much of it as made the assessment of 1873 conclusive as to the value of property would be void, and the remainder of the act, perfect in itself, could be carried into effect.

It makes no difference whether the supposed unconstitutional provision is in a separate section, or forms part of a

section otherwise constitutional. Judge Cooley says (p. 178), "The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall." Strike out the proviso from the end of § 2 of the Forest Park act and yet the remainder is "complete in itself and capable of being executed, in accordance with the apparent legislative intent."

IV. The Forest Park act is not inoperative because it directs the title to the land composing the park to be vested in the "people of the county of St. Louis," and not in the county of St. Louis, the ordinary legal designation of the political sub-division in which the park is located.

Taking for argument's sake, the position that the expression "people of the county of St. Louis" was inadvertently placed in the act, and that the name of the county alone should have been used, it is nevertheless clear that a conveyance to its people would enure to the benefit of the county as a *quasi* corporation. (Carder vs. The Com'rs of Fayette county, 16 Ohio St., 351; State vs. Piatt, 15 Ohio, 23; The Trustees of Green Township in Scioto County vs. John Campbell, 16 Ohio St., 11; Hornbeck's Ex. vs. The American Bible Society, 2 Paige's Chancery, 133; Potter vs. Chapin, 6 Paige, 649.)

Our own legislature has recognized by statute in respect to county contracts, the principle sustained in the above decisions. It enacted, (Wagn. Stat., 407) and the law has been for very many years among our statutes, that "all notes, bonds, bills, etc., whereby any person shall be bound to any county, or the inhabitants thereof," shall vest title in the county itself.

Moreover, it is a well known doctrine of equity jurisprudence, that no trust shall fail for want of a trustee, and the court, in such a case, will appoint one. Now it is beyond question that a title to Forest Park might be made to the people, or public, of St. Louis county, by the intermediation of a trustee. The park act, on its face, declares the park to be established for the use and benefit of the people of St.

Louis county. Therefore, if so much of the act as gives the St. Louis County Court possession of the park, and appoints commissioners to facilitate the use of it by its owner, the people, should be invalid, all that is needed is that a court of equity should appoint a trustee to assume the legal title rather than that the trust should fail. (Mackay vs. Dillon, 7 Mo., 7; Lebois vs. Brammel, 4 How., 457; Vasquez vs. Ewing, 24 Mo., 31.)

In fact, the ownership of land by the people themselves, by the public, is the very highest and most complete kind of property. It is the *dominium eminens.* (Cool. Con. Lim., 524, n.; Tollard's Lessee vs. Hagan, 3 How: 223.)

*John M. Krum,* for Appellant.

I. The act of 25th March, 1874, establishing Forest Park, is not in any particular in contravention of the constitution of Missouri.

That the general assembly has constitutional power, by legislation, to exercise the right of eminent domain, and that the general assembly may delegate this power, will not, I presume, be questioned or denied. It is a sovereign right of the State, and it attaches to the State as the right of property attaches to man. The right of eminent domain is a necessity of government.

The public use to which legislation of this character is directed, may spring out of various considerations, municipal, sanitary, or even public convenience.

These considerations are addressed to the general assembly (not to the court,) and the legislature, in the first instance, exercises its discretion, whether or not to exercise its power in the matter of eminent domain in every case.

The reasons or considerations which induce such legislation, need not be stated on the face of the law, which makes provision for a public use. After the enactment of such a law, the door is closed to all inquiry into matters or agencies which prompted its enactment.

The first paragraph of the act declares that "a public park is hereby established for the people of St. Louis county." A public park *ex vi termini*, expresses a public use. This is the very subject matter embraced in this act of the legislature —the county of St. Louis is a sub-divided portion of the State, and the welfare of the people of the county is a legitimate subject to receive the attention and action of the general assembly. The considerations which prompted this legislation, whether it was in view of municipal or sanitary purposes, or with a view to the public convenience, are now matters past finding out. The presumption, however, is that the end in view by the enactment of this law, is the public good, and this presumption supports the law.

Necessarily, in the very nature of things, there is a limit to judicial investigation and control. This court deals with a statute as it finds it on the statute book. The general assembly deals with subjects of legislation in its discretion, with a view to the public good and the ends of justice, restricted only by the limitations of the constitution.

Unless the act of the legislature is clearly evasive or there is a palpable usurpation of authority on the question of public use, the discretion of the legislature cannot be controlled by the court.

The taking of private property for public use is an act of the political power of the State. The necessity or utility of the taking is a question for the legislative department of the government and exclusively in the control of that department.

The whole question of expediency or inexpediency, and whether the law be or be not for the welfare of the State is left with the legislature.

The necessity for an appropriation of land by the legislature in the exercise of the right of eminent domain may not be questioned. If the use to which the lands are to be put is public, the legislature is the sole judge of the necessity.

As the legislature is the sole judge of the public necessity, which requires or renders expedient the exercise of the power of eminent domain, without the owner's consent, so it is the

exclusive judge of the amount of land or estate in the land which the public end to be subserved requires shall be taken.

What is a public use is for the legislature to determine in the first instance. (Coster vs. Tidewater Co., 3 C. E. Green, [N. J.] 518; Connor vs. Reed, 4 Pick., 460-3; Speer vs. Blairsville, 50 Penn., 150; Olmsted vs. Camp, 33 Conn., 532-552; Verick vs. Smith, 5 Paige, 137; Hartwell vs. Armstrong, 19 Barb., 166; Cochran vs. Gorley, 20 Wend., 365; Anderson vs. Tuberville, 6 Caldwell, 150; Concord R. R. vs. Greely, 17 N. H., 47; Scudder vs. Trenton Falls Co., 1 Saxton, 695; Fowler's Case, 53 N. Y., 60; 2 Dillon Mun. Corp., 555; Horton vs. S. & F. Nail Co., 8 Am. L. Reg., 179.)

II. The limitation or restriction of § 14, Art. XI. of the Const. is cited against the law in question. This act does not in terms, nor by implication, authorize the county to become a stockholder in, or to loan its credit to any company or corporation. The inhibition contained in this clause of the constitution, has no application to this case. The application attempted is a complete perversion of it. This case is in no sense like the case of Phelps county. There is no analogy between the two.

III. The condemnation of land for the purposes of the park, may be treated as a public easement, and no grantee need be named, nor is a grantee necessary to the complete establishment of such easment.

But if it is essential to the validity of the act that a grantee should be designated, I maintain that a grantee is designated and provided for in the law, not in terms, but by construction of the act itself. The county of St. Louis is a corporation and competent to take and hold real estate by gift, devise or grant. The county court (as is stated and claimed on the other side,) is established for the transaction of all county business. The condemnation or purchase of land for a park, under the act in question, I assume is "county business," and if the grant or title to the land is made to the county of St. Louis it will be valid, and if made to the people of the county of St. Louis, it will by intendment be construed to be a grant to the county itself.

Again, if it was intended by the general assembly that the title to the condemned land should be vested in some party, it is manifest that such vestment was intended as a trust for the county of St. Louis. Such must have been the intention of the general assembly. Now, a trust never fails for want of a trustee. If the party selected is incompetent to take title or act as trustee—if he dies, or becomes a felon or civilly dead, a court of equity will appoint a trustee, and by its decree vest its appointee with the title, and all authority needed in the premises. Therefore, if "the people of the county of St. Louis" is a nonentity, and cannot take title and execute the trust—and if the county itself cannot take and execute it, then a court of equity will appoint a trustee and thus prevent a failure of the trust.

*Glover & Shepley and T. T. Gantt*, for Respondents.

I. The court did not err in holding "The Act to establish Forest Park," etc., (Sess. Acts, 1874, p. 371) unconstitutional and void upon its face. Private property can only be taken against the will of the owner for some "public use."

If there be a public use or necessity demanding the appropriation of the property, the legislature may or may not, in its discretion, employ the right of eminent domain to take it, but if there be no such use or necessity, the right of eminent domain, though granted to the legislature, cannot be used. The power of the legislature in the exercise of the eminent domain, is limited to the case of a public use. If the public use appears as a fact, the legislature may authorize the taking of the property by the force of eminent domain, on "making just compensation." (Const., Art. 1, § 16.) But the courts must ultimately pass upon the question of "public use," or the constitutional provision would have no effect. When the legislature has authorized the taking of private property for what it deems a public use, the courts have jurisdiction to investigate that question ; to inquire into the facts, and unless the court finds the purpose for which the property is proposed to be taken is a public use in fact, the property will not be taken, even though directed by the legislature.

In this case, the court considered and disposed of the question whether "Forest Park" is a public use or not upon the face of the act, and held rightly, as we contend, that it is not. We can conceive of no reason that should demand a public park for St. Louis county.

A park is a public use only for a municipality, for a centre of dense population, where the population has become so dense that it requires, for its well being and protection, that it shall have appliances and institutions conferred only by municipal form of government.

The mere fact that a thing is a public use for a city, does not necessarily show that it is so where the population is not so dense that it has been found necessary to have municipal institutions.

Besides the general objection, that in no case can the creation of a park for an agricultural community be a public use, is the objection to this act in particular that it was not enacted to serve a public use, but is under the guise of creating a park for the county, attempting to give to the city of St. Louis that which would be a public use to it, at the expense of the taxpayers of the county.

This is shown by the fact that it is not where it would be easily accessible to the inhabitants of the county, but it is near the eastern verge of the county.

The court is authorized to take testimony and ascertain from all the facts, whether there is any public use in the case. (Harmony vs. Mitchel, 13 How., 115; Osborn vs. Hart, 24 Wis., 89; East St. Louis vs. St. John, 47 Ill., 463; Dingley vs. Boston, 100 Mass., 544; Anders vs. Tuberville, 6 Cold. [Tenn.], 150; Lecant vs. Police Jury, 20 La., 308; Memphis Ft. Co. vs. Memphis, 4 Cold. [Tenn.], 419; Carter vs. Tidewater Co., 3 Green, [N. J.] 54; Olmsted vs. Camp, 33 Conn., 532; Concord R. R. vs. Greely, 17 N. H., 47; Horton vs Squankum, 8 Am. L. Reg., 179; Scudder vs. Trenton Falls, 1 Saxton, 727; Lexington vs. Applegate, 8 Dana, 289.)

II. The right of eminent domain originates in public necessity and is limited by it. (2 Dill. Munic. Corp., 555; Fowler's Case, 53 N. Y., 60; Tyler vs. Beecher, 44 Vt., 650.)

In the late case, "In Matter of Wash. Av.," (69 Pa. St., 352,) the court appointed a commission to take testimony as to the use.

This Forest Park cannot be set up by a tax upon the county for the benefit of the city. (Cheancy vs. Hooser, 19 B. Mon., 330, 349; Mathews vs. Shields; 2 Met. [Ky.], 553; Arbequest vs. Louisville, 2 Bush. [Ky.], 271; Smith vs. Newport, 7 Bush. [Ky.], 37; Longworthy vs. Dubuque, 16 Ia., 271; Fulton vs. Davenport, 17 Ia., 407; Mitchel vs. Davenport, 34 Ia., 194; Butler vs. Muscatine, 11 Ia., 433; Dieman vs. Fort Madison, 30 Ia., 541; 2 Dill. Munic. Cor. § 633; Bradshaw vs. Omaha, 1 Neb. 16.)

III. The act is unconstitutional, because it is in violation of section 14, article 11, of the constitution.

The 14th section of the 11th article of the constitution provides, that "the general assembly shall not authorize any county, city or town to become a stockholder in, or to loan its credit to any company, association or corporation, unless two thirds of the qualified voters of such county, city or town, at a regular or special election to be held therein, shall assent thereto."

But it will be seen by reference to the words of the provision that it includes as well associations and companies as corporations. If the act creates substantially an association or company, and the county of St. Louis has no control or power over it, then the county of St. Louis is just as much excluded from loaning its credit by the issue of its bonds as if there had been a corporation created by the act.

That the board created by the act is no agency of the county of St. Louis is evident, when we consider that it does not appoint the board of commissioners.

"The language of the section makes no discrimination of the sort, nor does the main purpose of the prohibition require any such discrimination. What was the object of the restriction on county courts, city and town municipalities? The object was, plainly, to prevent them from taxing the people without their consent. No loan of credit was allowed to any

company, association or corporation, without consent of the people who had to pay it. The business of the company, association or corporation, is not referred to in the constitution. Whether educational, benevolent, individual or otherwise, whether public or private, the object is not considered. It is manifestly the intent of the constitution to prevent taxation without the assent of the tax-payers, and without regard to the purposes of the proposed tax." (State vs. Curators, etc., 57 Mo., 178.)

IV. The act is unconstitutional in this that it is an arbitrary interference with the rights of St. Louis county, and the people thereof, as declared and guaranteed by the constitution of the State.

When we come to examine what the act is, we find that the act does not simply authorize the County Court to establish the park, does not simply authorize it to contract in that behalf if it sees fit, and impose a tax upon itself if it chooses, leaving said County Court, county and people thereof free to act according to their own will and wants in the matter; but it assumes to establish the park without reference to the will or wishes of said county or people, or their local authorities, and compels the County Court to enter into contracts without its consent, and imposes upon the county an immense debt against its will, to be continually increased for years to come in the same manner. (The People, *ex rel.* Commissioners of Lincoln Park vs. The City of Chicago, 51 Ill., 17, 31, 32, 33 ; Hampshire vs. Franklin, 16 Mass., 87 ; Cheancy vs. Hooser, 9 B. Mon., 338 ; Opinion of Judges, 4 N. H., 570; Williamson vs. Leland, 6 Peters, 627.)

V. As to the operation of said act upon individual rights affected by it, in obtaining the land necessary for the park, the act is unconstitutional and is based upon setting in motion unconstitutional means to that end.

The act gives no power to take such lands at their value, but only at the amount of the appraisement, to be made in the manner described in section 2 of the act, and section 2 expressly requires the appraisers, when they fix the value of said land, to be guided by the assessment of 1873.

The assessment of 1873, was not made for the purposes of said act, and is no evidence of the value of any of said lands since that date. The act contains no provision for assessing the lands at their real value, and contains no provision which will permit the owners to agree on the value of the lands. By its terms no purchase can be made before an appraisement; no purchase can be made by virtue of said act at a higher sum than the amount fixed by the appraisement; no appraisement can be made at any other figure than the assessment of 1873. But this mode of fixing the value being unconstitutional, no other mode can be employed. (Lindell's Adm'r vs. Han. & St. Jo. R. R. Co., 36 Mo., 543; Soulard vs. City of St. Louis, 36 Mo., 540; Leary vs. Han. & St. Jo. R. R., 38 Mo., 485.)

There is no doubt that if the same act contains independent provisions, one of which is consistent and the other inconsistent with the organic law, one of them may stand though the other falls. Not so when the provisions are inter-dependent, and the one is the inducement, and as it were the condition of the other; and such is the case here. Here is an attempt, as we say, to do a thing in an illegal way. No provision is made for doing the thing in a legal way. It was no part of the scheme, that it should be done at all, except in the illegal way prescribed. To do it in a manner different from that indicated in the act, would be not to fulfill but defeat the legislative intention. Now, it has been often decided that if a legislative act provides for the doing of a thing only in a mode forbidden by the organic law, the whole act falls to the ground, because there is no room for the inference that the employment of other means had received the legislative approval. (Cooley Const. Lim., pp. 178, 179, 180; State vs. Com'rs of Perry Co., 5 Ohio, [N. S.], 507; Slawson vs. Racine, 13 Wis., 398; Warren vs. Mayor, &c., of Charlestown, 2 Gray, 99.)

VI. The act is unconstitutional in this. The title to the proposed park lands is to be made neither to a corporation nor any recognized legal political body or trustee for either.

The act says the title to the land shall "vest forever in the people of the county of St. Louis;" and by the first section, the park is "established for the people of the county of St. Louis."

It is not intended to vest in the "county of St. Louis," because if it did and .it was found that the park was double the size required, and that the cost of improving that vast area was creating great dissatisfaction, the legislature might be appealed to to allow a sale of a portion of it. Therefore, to prevent this result, this device was resorted to. That such a sale could be made, see the Brooylin Park Com. vs. Armstrong, 45 N. Y., 234, as to Prospect Park.

WAGNER, Judge, delivered the opinion of the court.

This case comes before us on an appeal from a judgment of the Circuit Court of St. Louis County, and the questions presented involve the constitutionality of the act of the legislature establishing Forest Park, approved March 25, 1874.

By the first section of the act a public park is established for the people of the county of St. Louis, to be called Forest Park, and its limits are designated and described. The County Court of the county is then authorized to purchase or condemn all the lands embraced within the defined boundaries for the purposes of the park, and there is a provision that before any purchase by the County Court of the property for the park, an appraisement of the property shall be made by three appraisers in the manner described in section two, and the County Court is forbidden to pay a larger sum for the property than the amount of the appraisement.

Section two provides that the County Court, by its presiding judge, shall file in the Circuit Court a petition setting forth the property, or any interest therein, sought to be condemned, the names of the owners thereof, and any matter deemed advisable or required by the Circuit Court. The Circuit Court is thereupon required to issue notice to the owners, or, if non-residents, bring them in by publication. This section then continues:

".If the defendants be found to be the owners of or otherwise interested in the property, the court shall, unless the parties agree upon appraisers, within twenty days, appoint three disinterested men to view and appraise the property sought to be condemned, or if either party requires it, a special jury of six shall be summoned to fix the value of the same. If any appraiser or appraisers refuse or fail to attend or act, the court may appoint another. The appraisers or jury shall hear testimony under oath, and return their report into court within ten days after they are qualified to act. Their report shall be under oath, and a concurrence of a majority of them fixing the value of the property, shall be sufficient. It shall state the value, in cash, of the property, or of the interest or estate therein sought to be condemned, and any other fact the court may require. Either party may except to the report, in writing, filed in the Circuit Court, within ten days after it is filed, and not thereafter. All such exceptions shall be determined by the court in a summary manner. If there be no exceptions, or the same be overruled, the court shall confirm the report, and give judgment accordingly. Each of said appraisers, or of said jury, shall have been a resident of said county for the five years next before his appointment, and an owner in fee of real estate in said county, and not interested in any of the lands of the park, or adjoining thereto; provided, in all cases, the assessment of the county assessor for the year 1873 shall be taken as a guide in fixing the value of property to be condemned or appraised."

By section three it is provided that whenever the County Court shall pay the amount so found to the party entitled to it, or pay it into the Circuit Court, the Circuit Court shall immediately order and decree that the title in fee to the property, and every other interest therein, be divested out of such owner and other persons interested, and vest forever in the people of the county.

The fourth section gives the County Court authority to issue the bonds of the county to an amount not exceeding the sum of $1,300,000, and to apply the same to the purchase of

any lands included in Forest Park, or to sell the bonds to such an amount as may be required for the payment of the property purchased or condemned, and to apply the balance, if any, to the improvement of the park.

The fifth section provides that for the payment of the bonds and the improvement of the park, the County Court shall increase the per centum of the county taxes one-half mill on the dollar; and the sixth section makes the county treasurer the custodian of all moneys arising from the sale of the bonds or from the tax.

The seventh section then organizes a board of commissioners as follows: Three to be appointed by the County Court of St. Louis County and confirmed by the Circuit Court in general term, and three to be appointed by the mayor of the city of St. Louis, and confirmed by the city council of the city. The commissioners thus appointed constitute the board of Forest Park commissioners, and the presiding justice of the County Court is made *ex officio* a member of the board. The commissioners have power to lay off, improve, adorn, and generally govern, manage and control the use of the park, and the avenue surrounding the same, and to appoint officers and agents, prescribe their powers and duties, and make rules and regulations therefor.

In accordance with the above act the plaintiff presented its petition to the Circuit Court against the defendants, praying for a condemnation and an appropriation of their lands. In that court a motion was made to quash the summons and dismiss the proceedings, because the court had no authority or power to proceed in the cause or make the orders prayed for by the petitioner.

The reasons assigned for the motion were that the act of the legislature, under which the proceedings were instituted, was unconstitutional; that the act was void for uncertainty and vagueness, and that the act was inoperative, inasmuch as there were no such legal person or political entity as the "people of the county of St. Louis," and no conveyance could be made to them. The court sustained the motion and

quashed the summons, and dismissed the cause. To this ruling an exception was duly taken and the cause was appealed to this court.

It will be perceived that the only question in the case, is, whether the act is constitutional. Upon principle and authority the rule is settled, that acts of the legislature are to be presumed constitutional until the contrary is clearly shown ; and it is only when they manifestly infringe on some provision of the constitution that they can be declared void. For that reason, wherever there is a doubt it is to be construed in favor of the validity of the enactment. (State vs. C. G. and St. Line. R. R., 48 Mo., 468.) That the law is unjust or impolitic or oppressive, will not authorize a court to declare it illegal, unless it violates some specific provision of the constitution. This subject was thoroughly discussed by Mr. Justice Gamble, in Hamilton vs. St. Louis County Court, (15 Mo., 3) where, in conformity with all the authorities, he stated the true doctrine, that no court was authorized to declare an act of the legislature void, without being able to point out some specific clause of the Constitution to which it was repugnant. A law may be unjust in its operation, or even in the principles upon which it was founded ; but that would not justify a court in expanding the prohibitions in the Constitution beyond their natural and original meaning, in order to remedy an evil in any particular case. These principles have now become axiomatic, and cannot be departed from.

It is contended, that in the present case the right of eminent domain could not prevail, because the park is clearly not for a public use ; that a park is a public use only for a municipality or a centre of a dense population, but that it is not demanded for the people of a county, and that here it is situated near one side of the .county, and therefore could not be beneficial or useful to the people of the more remote parts. It is true that the park is located in the eastern division of the county, in the vicinity of the city of St. Louis, and its establishment will be a great source of benefit to the inhabit-

ants of the city. But it must be borne in mind that although the city of St. Louis is a distinct municipality, it is, nevertheless, a part of the county. It comprises the greater proportion of the population of the county, and pays the greater part of the county taxes. The court house is situated in the city, but it was built by taxation from the city and county alike, and is for the use and benefit of all, notwithstanding it is a county building. The park may be outside of the city limits and may be very advantageous to its citizens, but it may still redound to the interests of other portions of the county; therefore, they all have an interest and derive a use from it; their united means construct and adorn it, and it is the county, including all its population, that is the real proprietor.

When it is once seen that the land which is sought to be appropriated under the power of eminent domain is for a public use, then the legislative authority over the subject cannot be restricted or supervised by the courts; when it is plainly perceived that there is an attempt to evade the law and procure the condemnation of property for a private use, or to accomplish an end which is not public in its character, then the courts will unhesitatingly declare the act void. Or if it was doubtful or questionable whether the use was public or not, testimony might be admissible to determine the fact. But where it is plainly taken for a public use, the necessity of the exercise of the power rests with the State. The legislature is the proper body to determine the necessity of the exercise of the power and the extent to which the exercise of it shall be carried, and there is no restraint upon the power, save that requiring that compensation shall be made. (The People vs. Smith, 21 N. Y., 597; The Brooklyn Park Co. vs. Armstrong, 45 N. Y., 234.)

This is the established doctrine on the subject. In the case of Dingley vs. City of Boston, (100 Mass., 544) a case relied on by the respondents, a statute was passed to enable the city to abate a nuisance, and for the preservation of the public health. It authorized the city to purchase, or other-

13—VOL. LVIII.

wise take the lands within a large district; provided for payment to the owners of damages for the taking, and directed the city to raise the grade of the territory so taken or purchased with reference to a complete drainage thereof, so as to abate the nuisance and preserve the health of the city. It was insisted that the law was unconstitutional, as being the exercise of a judicial power, and as authorizing the taking of a greater interest in the land than was necessary. But the court ruled against both these positions, and sustained the validity of the law. It was declared that when land and other property was taken by the legislature, for the purpose of a public use, the legislature determined what property should be taken, and they might properly refer to the judiciary the duty of appointing commissioners as officers of the court to hear the parties interested, and apportion among them the expense of the proceeding and of rendering judgment on the report of the commissioners, and issuing process to enforce their judgment.

· In Varick vs. Smith, (5 Paige, 137) it is said that the legislature is the sole judge as to the expediency of making police regulations interfering with the natural rights of citizens, which are not prohibited by the constitution, and also as to the expediency of exercising the right of eminent domain for the purpose of making public improvements, either for the benefit of the inhabitants of the State, or any particular part thereof.

The case of Scudder vs. The Trenton, Delaware Falls Co., (1 Saxt., 694) contains a very learned and thorough discussion of this question. There a bill was filed to procure an injunction to restrain the defendants from entering upon the property of the complainant, for the purpose of cutting and constructing a raceway, to conduct water from the river Delaware to a point below Trenton Falls. The right to cut and construct the raceway was claimed by the company by virtue of an act of the General Assembly of the State, entitled, "An act to incorporate a company to create a water power at the city of Trenton and its vicinity, and for other purposes." It

seems that the company was incorporated for manufacturing purposes, and their charter gave them the right to condemn and appropriate property for their use. The Chancellor, after examining the whole doctrine applicable to the right of the exercise of the power of eminent domain, remarks: "Before I undertake to express an opinion, it will be well to see that I am in the line of duty, for it is contended on the part of the defendants, that the power of judging on this subject is committed to the legislative department of the government alone, and that the judiciary cannot interfere. This doctrine the court can in no wise admit; the legislature in this State is not omnipotent, as was the British Parliament; it is subordinate to the constitution, and if it transcends its power, its acts are void, and it is the duty of the judiciary to declare them so. The duty is at all times unpleasant, but no independent tribunal will hesitate to do it in clear cases. The opinion of Chancellor Kent, in his Commentaries, (2 Kent, 276) does not support the position of the learned counsel. The author remarks that it undoubtedly must rest in the wisdom of the legislature to determine when public use requires the assumption of private property. I do not understand by this that the legislature is to be the sole judge of what is meant by public use; but that the fact being established that private property of a particular character may be taken and appropriated to public purposes, it is for the wisdom of the legislature to say when that appropriation shall be made. That the commentator did not intend to be understood as saying that the legislature was intended to be sole judge in this case is evident; for he admits afterwards that, if the legislature should take the property of A. and give it to B., the law would be unconstitutional and void; and yet, who is to judge that the property thus taken from one and given to another was not intended by the legislature for public use and benefit? Who is to declare it unconstitutional and void after they have determined its propriety. Not doubting that the court may safely sit in judgment on this matter, it only remains to inquire whether the use to which the property is to

be appropriated is a public use.   *   *   *   May we not, in considering what shall be a public use and benefit look at the objects, the purposes, and the results of the undertaking? The water power about to be created will be sufficient for the erection of seventy mills and factories, and other works dependent on such power. It will be located at the seat of government, at the head of tide water, and in a flourishing and populous district of country. *   *   *   Looking at this case in all its bearings, and believing, as I do, that great benefit will result to the community from the contemplated improvement, I am not satisfied to declare the act of incorporation, or that part of it which is now in question, void and unconstitutional. I do not see in it such a decided and palpable violation of the constitutional right as will warrant me to put an end to this work by the strong arm of the court.

The legislature have thought proper, in their wisdom, to exercise the right of eminent domain, for an object, which they deem of public use and importance, and, although their judgment is not conclusive as to the right, it is certainly entitled to a most respectful consideration." And the court held that the act was constitutional.

This case certainly goes far enough in upholding the right to appropriate property, and I have abstracted liberally from it because it is one of the principal cases relied on by the respondents. It is in precise accordance with the doctrine previously laid down in this opinion, that the court will determine whether the use is public, but when an affirmative to this question is reached, then the judicial function is gone, and there is no restraint upon the legislative discretion.

Many other authorities have been examined, but it is unnecessary to make special reference to them, as they sustain throughout the views above announced. Private property is taken for public use when it is appropriated for the common use of the public at large. A stronger instance cannot be given than that of property converted into a public park. A public park becomes the property of the pub-

lic at large, and is under the control of the public authorities; it may well be paid for by the public, as it is intended for public use. There is sufficient, then, on the face of this act to warrant us in holding that the park in question is for public use.

It is next objected, that the act is void because it violates section 14 of art. XI of the constitution. That section provides that "the General Assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to any company, association or corporation unless two-thirds of the qualified voters of such county, city or town, at a regular or special election to be held therein, shall assent thereto." To sustain this objection, the case of the State vs. The Curators of the State University, decided by this court at its last July term, is cited, (57 Mo., 178). The facts were these: That Phelps County undertook to issue its bonds and deliver them to a corporation established for a public educational purpose for the State, in order to obtain the location of a school of mines, without having first obtained the consent of the people of the county. This the court held the county could not do, and Judge Napton, who delivered the opinion, said: "What was the object of the restriction on the County Courts, city and town municipalities? The object was, plainly, to prevent them from taxing the people without their consent. No loan of credit was allowed to any company, association, or corporation without the consent of the people who had to pay it. The business of the company, association or corporation is not referred to in the constitution. Whether educational, benevolent, individual or otherwise, whether public or private, the object is not considered."

But the two cases are wholly different. They are neither parallel nor analogous. Phelps County was not authorized to establish a school of mines for the use of its own people, to own and manage it through commissioners appointed for that purpose. It was simply empowered to issue its bonds, or loan its credit, to the State University, a corporation entirely

foreign to its limits, and managed by trustees who were not appointed by it. The county got no property in exchange for its bonds, and had no voice in their negotiation, nor could it exercise any control over the proceeds after they were sold. In the present case there is no loaning of credit, or taking stock in any company, association, or corporation. A county debt is created for property conveyed to the county, and the taxation is imposed to pay off and discharge that debt. Nor do we consider it objectionable that the control and management of the park is committed to a board of commissioners, instead of the County Court. The twenty-third section of the sixth article of the constitution provides, that inferior tribunals, to be known as County Courts, shall be established in each county for the transaction of all county business, but that will not preclude the State from appointing other agencies in certain cases. Three of the commissioners are appointed by the County Court, the presiding judge of that court makes the fourth, and the three others are appointed by the City Council. Thus they all derive their powers, either directly or remotely, from the voters of the county. In principle, the board does not differ from the police board or the board of water commissioners, and it has been decided that the legislature had the undoubted constitutional right to establish these boards as a part of the local administration of municipal affairs. They are regarded as mere administrative officers or agencies for the performance of certain duties, and as such the establishment of their powers and their appointment have been held valid. (State vs. Valle, 41 Mo., 29; State vs. St. Louis County Court, 34 Mo., 546; People vs. Draper, 15 N. Y., 532; Daily vs. City of St. Paul, 7 Minn., 390.) The further point is insisted upon that the act gives no power to take lands at their value, but only at the amount of the appraisement, to be made in the manner described in section 2, and that that section expressly requires the appraisers, in fixing the value of the land, to be guided by the assessment of 1873. I do not think that the section will bear the construction that is thus attempted to be placed upon it.

The language is: "Provided, in all cases, the assessment of the county assessor for the year 1873 shall be taken as a guide in fixing the value of the property to be condemned or appraised." I am inclined to the opinion that what the framer of the section intended was that the different pieces of property appropriated should be adjusted according to the relative value placed upon them by the assessor in that year. If it was designed that the assessment made in 1873 was to be taken as the measure or standard in fixing the value for compensation, then unquestionably this part of the section is void. Property can only be taken or appropriated upon making just compensation. What is just is a matter of inquiry, ascertainable by either appraisers or a jury upon evidence furnished in the case. No law can arbitrarily fix a value on property and tell the owner that he shall take that. That would be assuming a prerogative utterly unwarranted and would be destructive of the rights of property. But does it follow that because this part of the section is unconstitutional the whole act is invalid? By no means. Nothing is better settled than that an act may be good in part and bad in part.

Where a clause in an act is rendered invalid on account of some constitutional prohibition, that will be stricken out or disregarded, but the other parts that are not liable to any such objection will remain good and the act will be enforced, provided enough is left to put it in operation and carry out the object had in view in its enactment. The second section provides that " the court shall, unless the parties themselves agree upon appraisers within twenty days, appoint three disinterested men to view and appraise the property sought to be condemned, or if either party requires it, a special jury of six shall be summoned to fix the value of the same.  *   *   * The appraisers or jury shall hear testimony under oath and return their report into court within ten days after they are qualified to act. Their report shall be under oath, and the concurrence of a majority of them, fixing the value of the property, shall be sufficient. It shall state the value, in cash,

of the property, or of the interest or estate therein sought to be condemned, and any other fact the court may require. Either party may except to the report, in writing, filed in the Circuit Court, within ten days after it is filed, and not thereafter."

This section is complete without the obnoxious clause. It furnishes the necessary and appropriate method for determining the value. It provides for appraisers or a jury, at the election of either party, whose duty it is to hear testimony and arrive at the actual cash value, which will furnish the criterion for just compensation. The objectionable proviso, therefore, may be entirely eliminated and the act will be good and capable of enforcement.

The last point to be examined is that the act is unconstitutional, because the grant of the proposed park land is to be made neither to a corporation nor to any recognized legal political body, nor to a trustee for either; that there is no such legal body or political entity as the people of St. Louis County. Aside from the well known doctrine that a trust never fails for the want of a trustee, that to prevent a failure a court of equity will interpose and appoint one, we do not think there is any merit in the objection. In an early day nearly all the grants of commons made to our towns were made to the inhabitants of the towns, and yet it has always been held that these commons were the property of the towns. In Patten vs. Chapin, (6 Paige, 649) the inhabitants of an incorporated neighborhood collected a fund and with it built a school house for their use, and it was decided that upon the incorporation of the neighborhood into a village, the title to the school house vested in the corporation. The case of the Trustees of Greene Township vs. Campbell, (16 Ohio St., 11) was where lands had been conveyed and vested in the legislature of the State, and the court held that it was the same, in legal effect, as if the title had been vested in the State *eo nomine*. To the same effect is Corder vs. Commissioners of Fayette County (*Id.*, 353). There the devise was made to the county by name, when the law required that it should be

made to the commissioners of the county. But the court said: "A devise to the county is a devise to the commissioners of the county, and vests the title in them for the uses of the county. The county and the commissioners of the county are often convertible terms." We therefore think it was immaterial whether the law provided that the title should be vested in the county or in the people of the county. They may be regarded as interchangeable or convertible terms. After a careful and attentive consideration of all the questions that have been presented and argued in this case, we have been unable to find in the act such an infringement of any specific provision of the constitution of this State as would authorize us to declare it void.

Wherefore the judgment below should be reversed and the cause remanded; all the judges concurring.