ELIJAH HARDING v. JOHN FUNK, *et al.*

1. MILL-DAM ACT. Chapter 66 of the General Statutes, entitled "An act to authorize the erection and maintenance of mill dams and mills," approved February 6th, 1867, is not unconstitutional and void. (See *Venard v. Cross*, ante, p. 248.)

2. FLOWAGE OF LANDS; *Measure of Damages.* Where one party builds a mill-dam under the Mill-Dam Act so as to overflow the land of another, the measure of the damages of the party owning the land is the difference in value of the land without the mill-dam, and the value of the land with the mill-dam.

3. ———— *Damages; Fords and Crossings.* The owner of the land through which the stream runs, on which a mill-dam is erected, has a right to show to the jury how much more it would cost to make a crossing for wagons after the mill-dam is erected and the stream raised in consequence thereof, than it would have cost before said mill-dam was erected.

### *Error from Jefferson District Court.*

THE case in the district court was an appeal by *Harding* from the award of commissioners appointed by the district court to assess damages under the Mill-Dam Act. *John Funk* and *William Daihl* erected a mill dam on their own lands, and thereby caused the water to overflow the lands of *Harding.* The commissioners awarded no damages to *Harding;* and on the appeal, the jury, in the district court, found that *Harding's* land had not been injured. *Harding* brings the case here by petition in error.

*Clough & Wheat,* and *Morse & Bennett,* for plaintiff in error:

1. The defendants in error had no lawful right to institute any such proceeding, because we submit that the said Act, (ch.

66, Gen. Stat.,) is unconstitutional and void, in so far as it authorized defendants in error to damage the lands of plaintiff in error—and defendants in error in their petition in effect *admit* they did damage him.

And in support of the proposition that that law is unconstitutional, we suggest that taking or damaging plaintiff's land under that act, is not taking it for *public*, but only for *private* use, and is therefore void. Cooley Const. Lim., 539; Sedgw. Const. L., 519; 2 Am. Jur., 25; 34 Ala. 311; 3 Barb., 47; 4 Ohio, 253; 8 id., 346; 6 How., 545; 40 Ill., 175; 39 id., 110; 11 Mo., 513; 25 id., 258, 277; 27 id., 373.

2. The taking the property of one individual, and the giving, or transferring of it to another, either with or without compensation, is not a proper subject-matter of legislation—and any statute attempting to do so, or to confer power on others to do so, IS VOID, irrespective of any constitutional inhibition on such acts. *In re, Peter Townsend*, 39 N. Y., 171; Cooley Const. Lim., 530; 38 Miss., 424; 52 Me., 265; 3 N. Y., 511; 4 Hill, 140; 18 Ill., 502; 41 id., 228; 11 Minn., 496; 19 Wend., 659; 8 Ohio St., 333; 21 Penn. St., 167; 31 Vt., 236; 16 Mass., 83; 3 Paige, 73; 3 Bland, 95; 5 Ohio, 393; 10 id., 296.

3. The court erred in not permitting the following question to be answered, when asked of several witnesses by plaintiff in error: "State what is the difference in the value of the land in question without the mill-dam erected, and the value of the land with the mill-dam erected." See Cooley Const. Lim., 567, et seq.; 7 Gray, 106; 13 id., 546; 2 Zabriskie, 495; 17 Wend., 669; 1 Iowa, 386; 11 Minn., 515.

The court also erred in not permitting Harding to show, and the jury to consider, the increased expense of making a ford across the stream on Harding's land by reason of the mill-dam. A ford for wagons would naturally and reasonably be needed on the land of plaintiff in error. The fact that there were fords on other lands which could be used by plaintiff, is immaterial. It cannot reasonably be expected that other people will always extend to plaintiff the courtesy of permitting him

to cross at their fords; nor have defendants any right to ask that he should request such permission, or pay for it.

*Ross Burns*, and *C. K. Gilchrist*, for defendants in error:

1. The opinions of witnesses as to the damages sustained by plaintiff in error are not competent evidence.    5 Ohio St., 573; 5 Selden, 37; 4 Barb., 256; 15 N. H., 109; 24 Wend., 668; 9 N. Y., 371.

2. Respecting the measure of damages, the inquiry should be, What is the difference in value of the land before erection of the dam and afterwards? Ch. 66, Gen. Stat., (Mill-Dam Act,) §§ 7, 10, 12, 14.   And no witness in this class of cases can give his *opinion* as an expert.

3. The Mill-Dam Act is valid.   If the public interest can be in any manner promoted by the taking of private property, it must rest in the wisdom of the legislature to determine that question.    2 Kent's Com., 340; 3 Paige, 73; 2 Peters, 251; 7 N. Y., 314; Angell on Wat., ch. 12; Cooley Const. Lim., 534 to 538; Washb. Eas. and Serv., 321 to 328.

4. The settled practice of free governments must be the guide in determining what is a public use.   Cooley's Const. Lim., 533.   The appropriation of private property for mills and mill-dams have each and all been held to be for the *public use*, though property is condemned and afterward owned by private parties.    12 Pick., 477; 12 Cush., 477; 3 Yerger, 41; 1 Chand., 71; 3 Wis., 415, 603; 33 Conn., 532; 13 Ired., 109; 1 Litt., 12; 1 T. B. Monroe, 58; 4 J. J. Marsh., 40; 6 Rand, 245; 13 Gray, 239; 10 Wis., 351.

The opinion of the court was delivered by

VALENTINE, J.: On the 7th of March, 1868, defendants in error filed their *ex parte* petition in the office of the clerk of the district court of Jefferson county under an act of the legislature entitled " An act to authorize the erection and maintenance of Mill-Dams and Mills," approved February 6th, 1867, in which petition, among other things, said defendants in error in substance said they " have erected and are

maintaining upon their own land in the village of Osawkee, in the county and State aforesaid, it being in the southeast quarter of section thirty, in township nine, of range eighteen, in said county, across the Grasshopper Creek, a water-course which is not navigable, a mill-dam, and they have raised the water within the banks of said stream, by means of said dam, nine feet above low-water mark, and by reason thereof have damaged the following tracts of land on said stream, to-wit: * * the north-half of section 18, township 9, range 18, owned by S. Gephart and E. Harding. * * * Said dam was erected for the purpose of obtaining a water-power to be applied to the running of a grist and saw mill. They therefore pray the court to appoint commissioners as provided by law, to meet at the site of said mill-dam, at such time as the court shall specify, to inquire touching the matters herein contained, and to make separate assessments of the damages which have resulted to any person or persons by reason of the erection and maintaining said mill-dam."

Commissioners were appointed by the court under the act aforesaid, to "view and assess the damages sustained, by reason of the erection and maintenance of a mill-dam across the Grasshopper Creek, to the tracts of land belonging to the parties in said petition specified," and they assessed no damages to Elijah Harding, and so reported. From this assessment or report Elijah Harding the plaintiff in error appealed to the district court, where a trial was had at the November Term, 1868, of said court, and the jury found for the defendants in error. Plaintiff in error moved for a new trial, which motion was overruled, and the court rendered judgment in favor of defendants in error against plaintiff in error for costs; and this is a proceeding in error to reverse said judgment.

The first point made by the plaintiff in error is, that the said act of February 6th, 1867, commonly known as the Mill-Dam Act, is unconstitutional and void, and therefore that all the proceedings under it had in this case are mere nullities. If this point is well taken we hardly see how the plaintiff in error could have been injured by any ruling of the district court.

His whole action is founded on said statute. The original proceedings upon which the proceedings in the district court and the proceedings in this court are founded were instituted under said act. It was the plaintiff in error who took the proceedings into the district court. It was the plaintiff in error who asked affirmative relief under said statute; and it is the plaintiff in error who brings the case to this court. If the said act was void, and the said proceedings a nullity, what could the district court do more than to dismiss the proceedings at the cost of the plaintiff, or appellant, who took them there? The district court however allowed the plaintiff in error to litigate the question in that court, whether he was entitled to damages as against the defendants in error, and upon a verdict of the jury against the plaintiff in error the court rendered a judgment against him for the costs of the suit only.

But said act is not unconstitutional. This we have just decided in the case of *Venard v. Cross*, (ante, p. 248;) and we have so decided upon almost if not entirely the unbroken current of authority in this country. But it is claimed that all the authorities upon this subject violate reason and principle, and therefore that we should abandon the authorities and cling to reason and principle only. Now it may seem a little presumptuous for any one to assume to be so much abler to determine questions upon reason and principle, and to be so much wiser than the eminent courts who have heretofore declared in favor of the validity of such acts; but without stopping to question the right of any one to do so, we will pass to the consideration of the question itself, remarking by the way, however, that if all those courts were ignorant, weak, or mistaken, it undoubtedly shows the weakness of human reason, the weakness of human intellect, and shows how incompetent even the learned are to grasp great principles, how incompetent even the wisest are to reach to the foundation of great constitutional questions; and considering the general frailty of the human intellect, perhaps it would not be wholly out of place to suggest that it is possible that even we—wise as we suppose ourselves to be—who differ from these courts, might possibly be mis-

taken ourselves. Such would not be wholly at variance with the experience of mankind. The wisest of us have probably at some time, and probably many times during our lives, found ourselves mistaken, notwithstanding our general inability to discover our own mistakes. But suppose we should abandon the authorities and depend entirely upon reason and principle for our guidance: what would likely be the consequences? We would at once abrogate the very foundation of all stability in human jurisprudence, and send the courts adrift without compass or chart. At one time the courts would decide a question a certain way, because they would believe such decision to be founded upon reason and principle; but soon finding themselves mistaken, they would wheel about, reverse their former decision, and decide the question another way, again supposing the decision to be founded upon reason and principle. But soon again they would undoubtedly find it necessary upon reason and principle to modify both their former decisions and decide still another way; and so on, *ad infinitum*. It is admitted that such cases might seldom occur; but still they would occur. The temptation to reach out into the great unknown, beyond where the human intellect has ever before gone, would be very great. The temptation to startle the world with the announcement of some hitherto undiscovered truth, would be almost irresistible. But however strong the temptation, or however liable the courts would be to yield thereto, such attempted grasp for new principles, or the announcement of them, would not come within the legitimate province of the judiciary. Let philosophers and political speculators discover, discuss, and promulgate new principles, and after long discussion and repeated trial, if such new principles are found to be true and valuable, then let the proper law-makers, and not the courts, enact them into laws. It is well known that not more than one in ten of all the supposed new principles that are imagined to be discovered are in fact principles at all. They are not founded in nature, or reason, and generally have no other or better foundation than the mere whim or fancy of those who originate them, and are generally worse than valueless

or useless. And if courts, who are about as liable to entertain whims and vagaries as other men of the same education, ability and experience, should weave such whims into the law, it might prove disastrous in the extreme. It would be much more disastrous than though the legislature should enact them into laws; for, as a rule, the legislature acts upon the future only, while the courts act upon the past. The legislature says this shall hereafter be law. The courts say this is and has been the law. When the legislature enacts that a certain thing shall be law, the people can regulate their conduct accordingly, however bad the act may be; but when the courts enact that a certain thing which was in fact not the law before shall be considered as having been the law in the past, it is impossible that the people could have regulated their conduct according to such enactment of the courts. And further, if the authorities are to be abandoned, it will no longer be necessary for lawyers to study the decisions, to ponder over volumes of legal lore, to ascertain what the law is upon any given subject, and be able to tell their clients what it is, for the law will no longer be found in the law books, but in the judges' brains. And if one does study the law books he may at any time be surprised if not astonished at the announcement of legal principles he never before dreamed of. But such a state of things could not last long. The lawyers would soon pray to have courts not possessed of so much intuitive wisdom, locked up within their own capricious brains, and pray to have courts who could know the law only as it is to be found in the law books. Other classes, too, would desire a change. They would pray for " a government of laws, and not a government merely of men."

It must be admitted that the decisions of courts are sometimes conflicting; and in such cases subsequent decisions must be against either one set or the other of such prior decisions. It must also be admitted that the decisions of courts are sometimes so palpably erroneous that they must be overruled whenever the same question is again brought before the courts. But these are only exceptional cases. The rule is, that when a decision has once been made settling a principle of law, the

principle must be considered as so settled until changed by the proper law-making power. The more decisions there are one way, the firmer the principle is considered to be settled. It must also be admitted that the decisions of other states are not authorities to the same extent as decisions of our own State. As a rule they are only advisory. If they are founded on statutes differing from ours, they are not authorities at all. If they are founded upon statutes like ours, or upon the common law, they are strongly advisory. If they are founded upon constitutional provisions or statutes identical with ours, and from which ours have been taken, if such decisions were made before the adoption of ours, they are almost conclusive authority. The decisions already mentioned, many of which we will hereafter more specifically refer to, were made in other States under constitutional provisions almost identical with ours, before ours was adopted, and from which ours was probably taken. Hence as authorities these decisions are almost conclusive upon the question under consideration. (*Comm'rs of Leavenworth v. Miller*, 7 Kas., 479, and cases there cited.)

Among the decisions above mentioned which sustain the validity of the Mill-Dam Acts, either directly or indirectly, we would refer to the following: *Shaw v. Wells*, 5 Cush., 537; *Miller v. Frost*, 14 Minn., 365; *Omstead v. Camp*, 33 Conn., 532; *Gay v. Caldwell*, Hardin, 68; *Cowan v. Glover*, 3 A. K. Marshall, 357; *Kepley v. Taylor*, 1 Blackf., 492; *Chapman v. Graves*, 8 Blackf., 308; *Harding v. Goodlet*, 3 Yerger, 41; *Newcomb v. Smith*, 1 Chand. (Wis.) 71; *Brower v. Merrill*, 3 Chand., 46; *Stephens v. Marshall*, 3 Chand., 222; *Johnson v. Roane*, 3 Jones Law (N. C.) 523; *Burgess v. Clack*, 13 Iredell, 109; *Hendrix v. Johnson*, 6 Porter (Ala.) 472; *Wooster v. Manf. Co.*, 39 Maine, 246; *Nelson v. Butterfield*, 21 Maine, 220; *Lumley v. Braddy*, 8 Iowa, 33; *Hoag v. Denton*, 20 Iowa, 118; *Hook v. Smith*, 6 Mo., 225; *Hawkins v. Lawrence*, 8 Blackf., 266; *McKinney v. Smith*, 21 Cal., 374, 381; *Hazen v. Essex Co.*, 12 Cush., 475; *McNally v. Smith*, 12 Allen, 455; *Boston v. Roxbury Mill Corp.*, 12 Pick., 467; *Wolcott W. M. Co. v. Upham*, 5 Pick., 292; *Burnham v. Storey*, 3 Allen

378; *Wright v. Pugh,* 16 Ind., 106; 12 Ind., 657; 1 T. B.
Mon., 58; 4 J. J. Marsh., 40; 4 Bibb, 464; 4 B. Mon., 410;
8 B. Mon., 533; 9 Wis., 166; 10 Minn., 30; 11 Minn., 253;
4 Harrington, (Del.) 197; 2 Bland, (Md.) 99; 10 Iredell, 100;
7 Iredell, 24; 7 Leigh, 446, 562; 10 Leigh, 332; 1 Rob., (Va.)
468; 4 Rand, 58; 33 Me., 480; 36 Me., 36; 42 Me., 64; 40 Me.,
317; 53 Me., 583; 1 Woodb. & M., 76, 87; Angell on Water-
courses, Ch. 12, and the numerous cases there cited; Washburn
on Easements and Servitudes, 321 to 352, ch. 3, § 5, and cases
there cited.

We suppose that it will be admitted that there is no pro-
vision or provisions in the constitution that either expressly or
impliedly prohibits the legislature from passing a Mill-Dam
Act.  The only question then is, whether such power has been
by any provision of the constitution conferred upon the legis-
lature.  Section 1, art. 2 of the constitution, confers all the
*legislative power* of the State upon the legislature; and legis-
lative power is simply the *law-making power*.  Therefore, if
an act of the legislature authorizing the owner of land to build
a mill dam on his own land so high that it will cause the water
to flow back upon another person's land and damage it, and
providing for paying such damage, is in its nature and essence
*a law,* then the act is constitutional; but if such act is not in
its nature and essence a law, then it is of course unconstitu-
tional.  There is only one reason given why such an act is not
in its nature and essence a law, and that reason is that such an
act provides for taking private property for *private use*.  We
suppose that it will be admitted that, if the act does provide
for taking private property for private uses *solely,* it is uncon-
stitutional.  On the other hand, we suppose it will be admitted
even by the plaintiff in error, that if the mill dam is authorized
for a *public use* solely, that the act is constitutional.  Now if
the mill is to be absolutely a private mill, the defendants in error
would have no right to erect their dam, as the dam would in
such a case be solely for a private use.  The fact, however, is
that the mills provided for under our statute, (chapters 65, 66,
Gen. Stat., 575 to 580,) are neither absolutely private mills nor

absolutely public mills, but they partake of the character of both. They might perhaps properly be called *quasi* public mills. It is not necessary for us to say what would be our decision upon this question if the same was a new question in this country. But it is not a new question. It has been long and well settled by legislative, executive, and judicial construction, practice, and usage; and we are not now at liberty to depart from such construction, practice, and usage. If we should do so, we should be making laws, and not merely construing them. (See authorities already cited.)

· In the case of *Talbot v. Hudson*, (16 Gray, 423 to 426,) the supreme court of Massachusetts hold the following language: "In many cases there can be no difficulty in determining whether an appropriation of property is for a public or a private use. If land is taken for a fort, a canal, or a highway, it would clearly fall within the first class; if it is transferred from one person to another, or to several persons, solely for their peculiar benefit and advantage, it would as clearly come within the second class. But there are intermediate cases where public and private interests are blended together, in which it becomes more difficult to decide within which of the two classes they may be properly said to fall. There is no fixed rule or standard by which such cases can be tried and determined. Each must necessarily depend upon its own peculiar circumstances. * * * The act is therefore in a certain sense for a private use, and inures directly to the individual advantage of such owners. But this is by no means a decisive test of its validity. Many enterprises of the highest public utility are productive of great and immediate benefits to individuals. A railroad or canal may largely enhance the value of private property situated at or near its termini; but it is not for that reason any less a public work, for the construction of which private property may well be taken. We are therefore to look further into the probable operation and effect of the statute in question in order to ascertain whether some public interest or benefit may, not be likely to accrue from the execution of the power conferred by it upon the defendants. If any such can be found, then we

are bound to suppose that the act was passed in order to effect it. We are not to judge of the wisdom or expediency of exercising the power to accomplish the object. The legislature are the sole and exclusive judges whether the exigency exists which calls on them to exercise their authority to take private property. If a use in its nature public can be subserved by the appropriation of a portion of the plaintiff's dam in the manner provided by this act, it was clearly within the constitutional authority of the legislature to take it, and in the absence of any declared purpose, we must assume that it was taken for such legitimate and authorized use. * * * It has never been deemed essential that the entire community, or considerable portion of it, should directly enjoy or participate in an improvement or enterprise in order to constitute a public use, within the true meaning of these words as used in the constitution. Such an interpretation would greatly narrow and cripple the authority of the legislature, so as to deprive it of the power of exerting a material and beneficial influence on the welfare and prosperity of the state. In a broad and comprehensive view, such as has been heretofore taken of the construction of this clause of the declaration of rights, everything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new sources for the employment of private capital and labor, indirectly contributes to the general welfare, and to the prosperity of the whole community. It is on this principle that many of the statutes of this commonwealth, by which private property has been heretofore taken and appropriated to a supposed public use are founded. Such legislation has the sanction of precedents, coeval with the origin and adoption of the constitution; and the principle has been so often recognized and approved as legitimate and constitutional that it has become incorporated into our jurisprudence. One of the earliest and most familiar instances of the exercise of such power under the constitution is to be found in the statute of 1795, ch. 74, for the support and regulation of mills.

By this statute, the owner of a mill had power, for the purpose of raising a head of water to operate his mill, to overflow the land of proprietors above, and thereby to take a permanent easement in the soil of another, to the entire destruction of its beneficial use by him, on paying a suitable compensation therefor. Under the right thus conferred, the more direct benefit was to the owner of the mill only; private property was in effect taken and transferred from one individual for the benefit of another, and the only public use which was thereby subserved, was the indirect benefit received by the community by the erection of mills for the convenience of the neighborhood, and the general advantage which accrued to trade and agriculture by increasing the facilities for traffic, and the consumption of the products of the soil. Such was the purpose of this statute, as appears from the preamble to the provincial acts of 8 and 13 Anne, from which the statute of 1795 was substantially copied. It is thereby declared that the building of mills has been 'serviceable for the public good and benefit of the town, or considerable neighborhood.' Anc. Chart., 388, 404." (16 Gray, 423 to 426.)

Judge Cooley says that "The settled practice of free governments must be our guide in determining what is a public use." (Cooley Const. Lim., 533.) Chancellor Kent says that "It undoubtedly must rest, as a general rule, in the wisdom of the legislature to determine where public use requires the assumption of private property." (2 Kent Com., 340.) And Chancellor Walworth says that "If the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for the purpose." (*Beekman v. S. & S. R. R. Co.*, 3 Paige, 73.) There are many decisions that sustain what these eminent jurists have said upon this subject. (See cases cited in counsels' briefs.)

We have purposely refrained from discussing said mill-dam

act in all its bearings, or to even intimate when or where, or to what kinds of mills, it will apply. We simply wish now to decide that it is not unconstitutional, and that there are cases where it may have some application.

The judgment in this case must however be reversed for another reason. The court below refused to allow any evidence to go to the jury to show, and refused to allow the jury to con-

2. Flowage of lands; measure of damages. sider, whether the plaintiff in error would be put to any additional expense in making a crossing for wagons, etc., over the stream on his own land, after the dam was erected and the stream raised in consequence thereof. This was error. The plaintiff in error claims, and we think correctly, that the true measure of his damages was the difference in the value of the land without the mill dam erected, and the value of the land with the mill dam erected. (Cooley Const. Lim., 568, and cases there cited; Angell on Wat., §§ 472 to 474, and cases cited; 1 Redf. on Rlys., 262, and cases cited; *Palmer Co. v. Ferrill*, 17 Pick., 58, 66.) Every fact tending to show said difference in value would be competent to be considered by the jury. The plaintiff in error would be entitled to his full damage. He would be entitled to show every fact that would tend to show that his land was less valuable, or could not be so conveniently used, with the mill-dam existing, as without it. And he would be entitled to show how much if anything it would cost more, in consequence of the mill dam, than without, to put his land in a condition to be used. It does not follow however from what we have said that the jury would be bound to give to the plaintiff in error damages sufficient to make a good crossing on said stream, or even any damages; for the *benefits* of the mill dam may have been much more than the *damages;* but the plaintiff in error had a right to have the matter considered by the jury.

For the error mentioned the judgment below must be reversed, and the cause remanded for further proceedings in accordance with this opinion.

KINGMAN, C. J., concurring.

BREWER, J., not sitting in the case.