[Civil No. 301.   Filed January 24, 1891.]

[26 Pac. 376.]

## GRANVILLE H. OURY, and THE COUNTY OF MARI-COPA, Defendants and Appellants, v. JAMES C. GOODWIN, Agent of the Territory of Arizona, Plaintiff and Appellee.

1. EMINENT DOMAIN—POWER OF TERRITORY TO PROVIDE FOR EXERCISE OF —REV. STATS. ARIZ. 1887, TITLE 22, "EMINENT DOMAIN," CITED—WITHIN LEGISLATIVE POWERS DELEGATED BY REV. STATS. U. S., 1878, SEC. 1851—IDEM, ORGANIC LAW OF ARIZONA, REV. STATS. ARIZ. 1901, PAR. 15, CITED.—Congress, having power to pass an act providing for the exercise of the power of eminent domain in the territory, has delegated this power, by section 1851, *supra,* to the territorial legislature.

2. SAME—PUBLIC USE—HOW DETERMINED.—There is no definition of a public use yet formulated to which one can go as a certain criterion. To know what is a public use which authorizes the power of eminent domain recourse must be had to cases rather than to definitions.

3. SAME—SAME—USES APPARENTLY PRIVATE—GENERAL WELFARE—PUBLIC POLICY.—In many instances where various states have clothed private corporations and individuals with the power of eminent domain there is no participation by the general public, and the public use consists in the purely incidental benefits. Peculiar conditions, and the great benefit that would result to the general public seemed to justify a public policy authorizing the taking of private property to promote the general welfare.

4. SAME—PRIVATE OWNERSHIP MUST YIELD TO PUBLIC NECESSITY—"PUBLIC NECESSITY" DEFINED.—All condemnation acts are predicated on the proposition that private ownership must yield to public necessity. "Public necessity" often means public convenience and advantage.

5. SAME—GENERAL LAWS—TO DEVELOP RESOURCES.—A territory may legislate by laws general in their operation, exercising the power

of eminent domain, that its advantages and resources may receive the fullest development for the general welfare.

6. IRRIGATION—PUBLIC POLICY—WATERS PUBLIC—PRIVATE OWNERSHIP —PRIVATE CONTROL—REV. STATS. ARIZ. 1887, PARS. 2863, 3198, 3201, 3202, CITED.—It is the policy of this territory to make the use of water within the reach of all, and to guard it against monopoly by private ownership on the one hand, and against being hemmed in by the ownership of the adjacent land on the other.

7. SAME—EMINENT DOMAIN—RIGHT OF WAY FOR DITCHES—CONSTITUTIONALITY—REV. STATS. ARIZ., TITLE 22, "EMINENT DOMAIN," CITED AND HELD CONSTITUTIONAL.—Title 22, "Eminent Domain," providing for the acquirement of a right of way for ditches to supply farming neighborhoods with water, is in accord with the public policy of the territory and is not in contravention of the constitution of the United States, the organic act of the territory, or any act of Congress.

8. STATUTES—CONSTRUCTION—EMINENT DOMAIN—LEGISLATURE—TO DETERMINE WHAT IS PUBLIC USE—DUTY OF COURT TO ENFORCE UNLESS CLEARLY UNCONSTITUTIONAL—EFFECT, LEGISLATIVE QUESTION.—It is in the first instance for the legislature to declare what are public uses to which private property may be appropriated. If such statute is constitutional, it is the duty of the court to enforce it. If there are doubts as to its constitutionality, if not clearly unconstitutional, being the act of a co-ordinate branch of the government, the courts should treat it as valid. If the law is unwise or oppressive, the power that created it must be looked to for its repeal.

APPEAL from a judgment of the District Court of the Second Judicial District in and for the County of Maricopa. Joseph H. Kibbey, Judge. Affirmed.

The facts are stated in the opinion.

A. Buck, for Appellants.

It is now well settled that while, if the use is public, the legislative discretion is absolute as to the expediency or necessity of exercising the power, the legislature cannot finally determine whether the use is public; that question is a judicial one to be answered by the courts. *Taylor* v. *Beecher*, 44 Vt. 548; *Laughbridge* v. *Harris*, 42 Ga. 500; *Concord R. R. Co.* v. *Greeley*, 17 N. H. 47, 57, 61; *Palort* v. *Hudson*, 16 Gray, 417, 421; *Bankhead* v. *Brown*, 25 Iowa, 540; *Custer* v. *Tide Water Co.*, 18 N. J. Eq. 54-63; *Harris* v. *Thompson*, 9

Barb. 350-362; *Matter of Townsend,* 39 N. Y. 171, 174, 181; *Hayward* v. *Mayor,* 7 N. Y. 314.

If the use be a public one, the decision of the legislature as to the necessity or propriety of the taking, and as to the manner and the instruments of the taking, whether by the state itself or by individuals or corporations, is final. *Ford* v. *Chicago R. R. Co.,* 14 Wis. 609, 80 Am. Dec. 791; *People* v. *Smith,* 21 N. Y. 597; *Hays* v. *Risher,* 32 Pa. St. 189; *Railroad Co.* v. *Lackland,* 25 Mo. 515; *Railroad Co.* v. *Gott,* 25 Mo. 540.

Land cannot be condemned for private ways, and statutes authorizing such taking for ways which are private are invalid, although the ways be designated neighborhood roads. *Dickey* v. *Tennison,* 27 Mo. 373; *Nescitt* v. *Trambo,* 39 Ill. 110, 89 Am. Dec. 290; *Grear* v. *Crosby,* 40 Ill. 175; *Osborn* v. *Hart,* 24 Wis. 89, 1 Am. Rep. 161.

The distinction between a public and a private use is clearly defined in *Hilmer* v. *Lime Point,* 18 Cal. 251, 252; *Memphis Freight Co.* v. *Memphis,* 4 Cold. 425.

There must be some true criterion in order to ascertain whether property is about to be taken for public or private use. What this criterion is must depend upon the nature and character of the use.

What is a public use? It is defined to be a use in which the public have a right to participate. A public road or bridge, or a street in a town or a city, and the like. They may be located where but few people make use of them, but they are of such a character that anybody who chooses may make use of them. A public use, then, is one in which anybody who chooses has a right to participate.

On the contrary, a private use is where the owners thereof have such right of property and control of the use as enables them to allow any one whom they may choose to participate in its benefit to the exclusion of all others; in other words, a use where the owners have the right to dispose of the benefits and privileges at whatever price they see fit, and to whom they see fit, to the exclusion of others, and over such the legislature has no control.

The evidence in this case is, that a certain number of men own a certain amount of land, that each of these own stock in the ditch in proportion to their land; that the water to be

Arizona 3—17

carried through the ditch, passing through the land which they wish condemned, is all owned by them, and they are to be the exclusive owners of the ditch. The general public, under the testimony in this case, is to have no rights in the ditch, nor in the water passing through it. It is to be a private concern, in which no outsider is to participate. How can the enterprise be anything more or less than a private enterprise, in the fullest sense of the term? In this case the owners of the rights in the ditch are owners of a private right, as much so as the right which they have in the lands which the testimony shows they own. If the land can be condemned in this case, then land may be condemned on the request of a single individual for the purpose of irrigating the smallest subdivision of land, a matter in which the public would not and could not have any right.

We do not contend that irrigation ditches cannot be constructed in accordance with a plan which would constitute the same a public use. A canal constructed for the purpose of distributing water to the public might be such as would be a public use, but the evidence in this case falls far short of showing the existence, or the proposed existence, of any such concern.

Private property cannot be taken for private use. *Lambert* v. *Hoke*, 14 John. 383; *Herrick* v. *Stover*, 3 Wend. 380; 2 Kent's Commentaries, 340; *Wilkinson* v. *Leland*, 2 Pet. 857; Story on the Constitution, 861; *In re Albany St.*, 11 Wend. 149, 25 Am. Dec. 618 and note; *Bloodgood* v. *Mohawk etc. R. R. Co.*, 18 Wend. 59, 31 Am. Dec. 313, and note; *In re John and Cherry St.*, 19 Wend. 659; *Taylor* v. *Porter*, 4 Hill, 140, 40 Am. Dec. 274, and note.

W. J. Kingsbury, for Appellee.

The right of eminent domain may be exercised in behalf of the following public uses: . . . canals, ditches, . . . and for supplying farming neighborhoods with water, . . . and reclaiming lands. Rev. Stats. Ariz., par. 1762, subd. 4, (Same in Cal. Code Civ. Proc., sec. 1238); Cooley on Constitutional Limitations, 532.

Any person may without further legislative action acquire private property for canals and ditches for supplying farm-

ing neighborhoods with water and reclaiming lands. Rev. Stats. Ariz. 1766, 1762. (Same in Cal. Code, par. 1001.)

"Farming neighborhoods." *Lux* v. *Haggin,* 69 Cal. 255, 10 Pac. 700. .

In general the legislature is the sole judge of what constitutes a public use. But to a very limited extent the constitutionality of a statute purporting to confer the right to take private property for public use is a judicial question. Courts will only interfere when there is no semblance of public benefit, or when the absence of all pretense of public interest is clear. *Gas Co.* v. *Richardson,* 63 Barb. 437.

If the public interest can in any way be promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain. 2 Kent's Commentaries, 340; *Gilmer* v. *Lime Point,* 18 Cal. 229.

The necessity for appropriating private property for the use of the public is not a judicial question. The power resides in the legislature. *People* v. *Smith,* 21 N. Y. 595; *Tidewater Co.* v. *Coster,* 18 N. J. Eq. 518, 90 Am. Dec. 634; *Lux* v. *Haggin,* 69 Cal. 255, 10 Pac. 696.

Supplying water to "farming neighborhoods" for irrigation, in view of the arid soil, etc., is what the legislature has decided it to be—a public use. *Dicta* in *Lux* v. *Haggin,* 69 Cal. 255, 10 Pac. 699.

The right to acquire private property for irrigating-ditch purposes exists in favor of those holding lands so situated as to make it necessary to cross the lands of others independent of any statutory provision. The servitude arises not by grant but by operation of law. Hallett, C. J., in *Yunker* v. *Nichols,* 1 Colo. 551.

GOODING, C. J.—This is an action under title 22 "Eminent Domain," of the Revised Statutes of Arizona, act approved March 9, 1887, to condemn real estate of appellant for the purpose of a canal or ditch for irrigating purposes. The appellant contends—1. That the legislature had no power to pass the act; 2. That the court, and not the legislature, must be the final judge of what is a public use, as distinguished

from a private use; and 3. That the use in this case is private, and not public.

These are questions of the utmost importance in this territory, and have been presented and argued with ability commensurate with their importance. Was the act, "Eminent Domain," beyond the power and authority of the legislature, and therefore void? The organic law of Arizona provides (U. S. Rev. Stats. 1878, sec. 1851): "The legislative power of this territory extends to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States. But no laws shall be passed interfering with the primary disposal of the soil. . . ." The exercise of the power of eminent domain is certainly "a rightful subject of legislation." The various and imperative demands for the exercise of this power are so obvious as to preclude the idea that Congress did not intend to confer it by the language used in the organic act. Public buildings, public roads, railroads, canals, water-works, sewers, gas, electric lights, and all the modern improvements of a public character are dependent on the exercise of this power. Not only is the exercise of the power of eminent domain a "rightful subject of legislation," but this power is implied from the negative. "But no law shall be passed interfering with the primary disposal of the soil." The primary disposal, it is needless to say, is the disposal of it by the government when it parts with its title. The legislature has the power to determine and fix by what tenures lands in the territory shall be held, and under what forms titles shall pass, and who shall be the heirs at the death of the proprietor and pass other like laws. The purpose of the Organic Act was to transfer from Congress to the territorial legislature the power that Congress had to pass laws for the people of the territory upon "all rightful subjects of legislation." The territorial legislature is substituted for Congress, and clothed with the power of Congress, except that it may not pass laws interfering with the primary disposal of the soil, nor tax the property of the United States, nor tax the lands or other property of non-residents higher than the lands or property of residents. That Congress had the power to pass an act providing for the exercise of the power of eminent domain in the territory no one will question. That it

has delegated this power to the territorial legislature we think is quite clear. Cooley on Constitutional Limitations, 650, says: ''In the new territories, however, where the government of the United States exercises sovereign authority, it posses- ses, as incident thereto, the right of eminent domain, which it may exercise directly or though the territorial governments.''

Was the property taken for a private or public use? The court below found that the property in question was sought to be condemned for a ''use authorized by law,'' and was necessary for said use. The ''statement of facts'' is the evidence taken on the trial. It appears that the ditch in question is connected with the Tempe Canal, and what is known as the ''Southern Branch.'' Mr. Goodwin says: ''Our branch is not an organization of its own. It is a part of the southern branch, in which Mr. Oury owns stock; it is a part of the same canal.'' He further states that: ''The zanjero of the southern branch has charge of our canal; our canal is just a part of the southern branch.'' ''The directors of the southern branch have control of our ditch as well as the southern branch; the whole business is under one set of directors.'' He further states that there are about eight thousand acres of land under the ditch, desert land, worthless without irrigation. He further mentions the names of thir- teen persons who own stock, and states that none of these shareholders own more shares than is necessary to irrigate their land, and that it was the intention to give each share- holder sufficient to irrigate his own land. That others besides these shareholders owned land within the boundaries marked and as covered by the canal. The ditch is owned by a joint- stock association, not a corporation. That about one thousand inches of water was used through the canal, and the share- holders owned about two thousand acres. The one thousand inches of water run through the ditch was owned by the shareholders in the Tempe canal, and in the southern branch both. That one hundred inches would be used to one hun- dred and sixty acres, sometimes more. These facts, not con- tradicted, bear on the question of the use being a public use, or a purely private use. The other facts we deem it unnecessary to set forth, as the controversy arises on the facts above set out. The amended complaint alleges, among other

things, that the "plaintiff is a resident of the territory of Arizona, county of Maricopa, and an agent of the said territory for the purpose hereafter mentioned, by virtue of title 22 of the Revised Statutes of said territory, and as such agent brings this suit against the defendants for the purposes mentioned aforesaid"; and in paragraph 4, in substance, "that plaintiff, J. C. Goodwin, Robert G. Goodwin, James McClintock, Robert J. Martin, James Gilliland, T. G. Cartlidge, Fisher G. Bailey, Douglas Lemon, Adams, and numerous other persons, farmers residing in the Missouri Flat neighborhood, county and territory aforesaid, are the owners of about eight thousand acres of arable and irrigable lands in said neighborhood, wholly valueless without irrigation," etc.; and prays "to condemn the land for the purposes mentioned in the complaint." The damages, as found by the court, amounted to $124.50.

Do the facts of the case disclose that the use was a "use authorized by law,"—in other words, a public use, in the view of the law? There is no definition of a public use that has yet been formulated to which we can go as a certain criterion. To know what is a public use which authorizes the exercise of the power of eminent domain, we must have recourse to cases rather than definitions,—to uses that have been held to be public. There are certain uses about which there is no controversy. Property taken for state-houses, for court-houses, for school-houses, for public roads, and the like, which pass under the immediate control of the public authorities, are cases of clear and direct public uses. Property taken for railroads, canals, and the like have also been conceded to be taken for public uses. In this class of cases the property is not in the possession of or controlled by the officers or agents of the public. Private individuals own and control the property. The title to the property is not in the public, nor is the possession or control, as in the case of court-houses, school-houses, etc. The public use consists in the right of the people to transit and transportation at reasonable rates. The public receives a benefit and advantage in this: that a new and better means of travel and transportation is afforded. In other words, in this class of cases it is conceded that the property of the individual owner is properly and lawfully

taken, because the general public receives a convenience and advantage, and a right to participate in the use. But there is another class of cases on an entirely different basis. In a number of the states where the physical conditions of the country offer inducements for the construction and erection of mills for grinding grain or sawing lumber, laws have been passed authorizing individuals and private companies to condemn mill-sites. These laws have been sustained in the states where they have been enacted, though questioned, criticised, and often the authority denied, outside of the jurisdictions where the benefits are enjoyed. Upon what principle or reasoning can these laws be sustained? The public do not participate in the title to the property condemned; nor in the possession or control; nor in the use direct, as in the case of railroads, canals, etc. The courts which have upheld these laws as constitutional rank among the first in the country. We refer to the following cases on this point, and other points in this case: *Beekman* v. *Saratoga etc. R. R. Co.,* 22 Am. Dec. 705; *Holyoke Co.* v. *Lyman,* 15 Wall. 507; *Tide-Water Co.* v. *Coster,* 18 N. J. Eq. 518, 90 Am. Dec. 634; *In re Application for Drainage of Lands,* 35 N. J. Law, 497; *Hartwell* v. *Armstrong,* 19 Barb. 166; *Shaw* v. *Railroad Co.,* 16 Gray, 415; *Norfleet* v. *Cromwell,* 70 N. C. 634, 16 Am. Rep. 787; *Lowell* v. *Boston,* 111 Mass. 454, 15 Am. Rep. 39; *Talbot* v. *Hudson,* 16 Gray, 417; *Mill Corp.* v. *Newman,* 12 Pick. 467, 23 Am. Dec. 622; *Jordan* v. *Woodward,* 40 Me. 317; *Manufacturing Co.* v. *Fernald,* 47 N. H. 444; *Ash* v. *Cummings,* 50 N. H. 591; *Hazen* v. *Essex Co.,* 12 Cush. 477; *Harding* v. *Goodlett,* 3 Yerg. 41, 24 Am. Dec. 546; *Hankins* v. *Lawrence,* 8 Blackf. 266; *Olmstead* v. *Camp,* 33 Conn. 532, 89 Am. Dec. 221; *Venard* v. *Cross,* 8 Kan. 248; *Thien* v. *Voegtlander,* 3 Wis. 461; *Higginson* v. *Inhabitants of Nahant,* 11 Allen, 530; *Commissoners* v. *Armstrong,* 45 N. Y. 234, 6 Am. Rep. 70; *County Court of St. Louis Co.* v. *Griswold,* 58 Mo. 175.

In *Holyoke Co.* v. *Lyman,* 15 Wall. 507, Clifford, J., says: "Authority to erect dams across such streams for mill purposes results from the ownership of the bed and the banks of the stream; or the right to construct the same may be acquired by legislative grant, in cases where the legislature is of the

opinion that the benefits to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain; and, to authorize such an interference with private rights for that purpose, lands belonging to individuals have often been condemned for such purpose, in the exercise of the right of eminent domain, in cases where, from the nature of the country, mill-sites sufficient in number could not otherwise be obtained; and that right is even more frequently exercised to enable mill-site owners to flow the water back beyond their own limits in order to create sufficient power or head and fall to operate their mills." *Mill Corp. v. Newman*, 23 Am. Dec. 627, says: "But it is said the analogy fails when applied to laying bare the flats in order to get the water-power for mills, because the public have no right in respect to the manufactories, as they have to travel on the turnpike roads. But the public may be well said to be paid or compensated in the one as well as in the other case, and are benefited by the one improvement as well as by the other. Take the grist-mill established in this city as an example. Is it no benefit to have the corn ground near to the inhabitants, rather than at a distance? But you cannot compel the miller to grind your corn for the toll, as you may the proprietors of the turnpike to let you travel over the road for a toll. . . . For more than a century the mill-owners had the right to raise a head or pond of water by flowing the lands of others, paying the damage. In many such cases valuable meadows have been inundated, and thus private property has been taken without the consent of the owners, excepting only as they may be supposed to have consented to the laws made by the legislature. But for these 'Mill Acts,' as they are called, the mill-owner might have been liable for the damages as at common law, or the owner of the land might have removed the dam as a private nuisance. But under and by virtue of these acts the dam is protected. The owner of the land is thereby deprived of the entire dominion of his soil, because the public good required the sacrifice of his lands for a reasonable price. Now, we have nothing to do with the expediency of these various mill acts, but it is entirely apparent that the legislature have considered it for the public good to encourage the erection of mills, and have

subjected the property of citizens to the control of mill-
owners, they paying the damage. The principle is that the
lands of individuals are holden subject to the requisitions
of the public exigencies, a reasonable compensation being paid
for the damage. It is not taking the property of one man and
giving it to another. At most, it is a forced sale to satisfy
the pressing want of the public. Now, this is as it should
be. The will or caprice of an individual would often defeat
the most useful and extensive enterprises if it were otherwise.''
It is not claimed in the case just cited that the right of the
general public to participate is the basis of the right to con-
demn. The resulting benefits are held sufficient, and are
relied upon as justifying the exercise of this power.

In *Scudder* v. *Falls Co.,* to be found in 23 Am. Dec. 770,
the court discusses what is a public use, and on what the power
of eminent domain is based. The case is stated in these
words: ''Whereas, the object of the present franchise is
to create a water-power and erect thereon extensive manu-
facturing establishments. These will be under the control
of individuals. The company will either build or lease. They
may build for themselves or lease to whom they please, and
they are under no obligation to let the public participate in
the immediate profits of their undertaking. If to establish
this as a public benefit, it is indispensably necessary that
the public should have the privilege of participating in it
directly and immediately, then the proposition is not made
out, and the defendants have no authority. But is not this
view too narrow? Can public improvements be limited within
such a compass? May we not, in considering what shall be
deemed a public use and benefit, look at the objects, the pur-
poses, and the results of the undertaking?'' In this case,
decided as early as 1832, it was held that the use was public,
and not private, because of the incidental benefits to the
public. There was to be no participation by the public, only
the incidental benefits. The court further says: ''Nor is it
[eminent domain] limited to private corporations whose sole
object, or even whose primary object it is to promote the
public good. Such corporations are not to be found. Private
interest or emolument is the *primum mobile* in all. The public
interest is secondary and consequential.'' And again: ''The

ever-varying condition of society is constantly presenting new objects of public importance and utility, and what shall be considered a public use or benefit may depend somewhat on the situation and wants of the community for the time being." 22 Am. Dec. 700. After referring to a number of cases wherein it has been held that "Mill Acts" are constitutional if the public have the right to participate, the court goes on to say: "But in many of the states the validity of statutes authorizing the condemnation of sites and the flowage of land, for the establishment and maintenance of mills and other manufactories, has been upheld on the broad ground, that, without regard to any actual right of the public in the use of them, they are of such public utility as to be in the nature of public improvements." *Olmstead* v. *Camp*, 33 Conn. 532, 89 Am. Dec. 221; *Todd* v. *Austin*, 34 Conn. 78; *Occum Co.* v. *Manufacturing Co.*, 35 Conn. 496; *Grammell* v. *Potter*, 6 Iowa, 548; *Venard* v. *Cross*, 8 Kan. 248; *Harding* v. *Funk*, 8 Kan. 315; *Cogswell* v. *Essex Mill Corp.*, 6 Pick. 94; *Fiske* v. *Farmingham Co.*, 12 Pick. 68; *Mill Corp.* v. *Newman*, 12 Pick. 467, 23 Am. Dec. 622; *Hazen* v. *Essex Co.*, 12 Cush. 475; *Miller* v. *Troost*, 14 Minn. 365, (Gil. 282); *Manufacturing Co.* v. *Fernald*, 47 N. H. 444; *Newcomb* v. *Smith*, 1 Chand. (Wis.) 71; *Fisher* v. *Horicon*, 10 Wis. 351; *Holyoke Co.* v. *Lyman*, 15 Wall. 507, per Clifford, J.

In 47 N. H. 456, this question is put: "Or, to put the question in a general form, is it of such general public advantage that the streams and waters of this state should be brought into practical use for manufacturing purposes that a private right standing in the way of the enterprise, designed to accomplish extended and connected improvements in the water of a large stream, . . . is taken for a public use when taken to advance such an enterprise and remove an obstacle to its success? The act authorizing the property taken was sustained by the court. In the case of *Tide-Water Co.* v. *Coster*, 18 N. J. Eq. 521, 90 Am. Dec. 634, it is held that the right of eminent domain could be employed for the purpose of reclaiming large tracts of tide-water land, and based its decision on the ground that 'it is the resulting general utility which gives such an enterprise a kind of public aspect, and invests it with privileges which do not belong to mere

private interests.' The case of *Head* v. *Manufacturing Co.*, decided by the supreme court of the United States at the October term, 1884, (113 U. S. 16, 5 Sup. Ct. Rep. 441,) is instructive on the subject of the 'Mill Acts' of many states, and does not deny their constitutionality, even in the instances where there is no pretense of a right on the part of the public to participate, except in the resulting benefits. The general mill act of New Hampshire authorized 'any person or any corporation' to erect a dam flowing the lands of others, paying the owners of land flowed damages to be assessed 'by a committee or a jury.' In that case, as in this, it was claimed that it was taking private property for private use, contrary to the constitution. The taking was held to be lawful, on the right of the legislature to make laws affecting such cases. When property in which several persons have a common interest cannot be fully and beneficially enjoyed in its existing condition, the law often provides a way in which they may compel one another to submit to measures necessary to secure its beneficial enjoyment, making equitable compensation to any whose control of or interest in the property is thereby modified.''

But we desire to quote from this decision of the highest court in the land, and of so recent delivery, for the purpose of showing the strength of the authorities on the propositions involved in this case. First, the act which is sustained gives the right to ''any person or any corporation'' to flow the lands of others; that is, as held in many cases, to take them. Further it says: ''General mill acts exist in a great majority of the states of the Union. Such acts authorizing land to be taken or flowed *in invitum* for the erection and maintenance of mills, existed in Virginia, Maryland, Delaware, and North Carolina, as well as in Massachusetts, New Hampshire, and Rhode Island, before the Declaration of Independence, and exists to this day in each of these states except Maryland. . . . They were enacted in Maine, Kentucky, Missouri, and Arkansas soon after their admission into the Union. They were passed in Indiana, Illinois, Michigan, Wisconsin, Iowa, Nebraska, Minnesota, Mississippi, Alabama, and Florida while they were yet territories, and re-enacted after they became states. They were also enacted in Pennsylvania in 1803, in

Connecticut in 1864, and more recently in Vermont, Kansas, Oregon, West Virginia, and Georgia, but were afterwards repealed in Georgia. In most of these states their validity has been assumed without dispute; and they were never adjudged to be invalid anywhere until since 1870, and then in three states only, and for the incompatibility with their respective constitutions. "The principal objects, no doubt, of the earlier acts were grist-mills; and it has been generally admitted, even by those courts which have entertained the most restricted view of the legislative power, that a grist-mill which grinds for all comers, at tolls fixed by law, is for a public use. But the statutes of many states are not so limited either in terms or in the usage under them. In Massachusetts for more than half a century the mill acts have been extended to mills for any manufacturing purpose. And throughout New England, Pennsylvania, Virginia, North Carolina, Kentucky, and many of the western states, the statutes are equally comprehensive." I have quoted thus fully because the expression is that of the supreme court of the United States, and as recent as 1884; and because it shows that these acts are not sustained as constitutional because of the right having been exercised before the adoption of the constitutions, though many cases place the right or power on that ground; and, further, because in my opinion, the mill acts of the numerous states have far less foundation in public necessity or public utility than the water acts of Arizona, and because the similarity of the acts is apparent. Under the mill acts any person or corporation may take private property for their use, the benefits being the general and resulting benefits to the public. Under the water acts any person or corporation may take right of way for water. The mill acts are held valid where there is no participation by the public. Is it then necessary that there should be participation direct under the water acts, to obviate the objection of its otherwise being a private, and not a public use? In some of the drainage acts of the various states and territories there is no participation. I am not unmindful of the fact that some cases place the lawfulness of both the mill acts and the drainage acts under the power of the legislature, expressed by the court in the case from which we have just

quoted, viz., the right to compel owners of private and separate property to join with other owners of private and separate adjoining property to improve the same *in invitum,* as by a common ditch, party-walls, etc. In the case of the exercise of the power of emₙnent domain, the individual has a portion of his property taken for which ample compensation is made. In the case of a resort to the other power, as in the drainage acts or some of them, the part not taken may be sold at a sacrifice to pay assessment for the benefits. But there are many cases where the power must rest on the right of eminent domain, as where one man's land is flowed for the benefit of another man's mill; where a right of way is taken over one man's land for a ditch to drain the swamp lands of one or more of his neighbors. In all these cases the private property of the individual is taken, and it is of little concern to him under what particular power. If under the power of condemnation, he gets compensation for what is taken. If under the power to assess for improvement, a forced sale of all may result in a sacrifice of all. If the constitution cannot protect in the latter case, ought it to be invoked in the former to the detriment of the community, and against a general beneficial public policy, growing out of peculiar and extraordinary physical conditions of the country? The counterpart in principle to the proposition involved in this case is to be found in the drainage laws of various states, especially on the sea-coast. There it is to get water off the soil; here it is to get it on to and in the soil. What difference can there be in principle? Some of the cases base the lawfulness of the drainage acts on the plea (may we not say in many cases, pretext) of promoting the public health. Many other cases base the right on the broad ground of public benefit and utility. 22 Am. Dec. 705. Rodman, J., said, in sustaining the act to condemn: "If 'public utility' is synonymous with 'public use,' the case is still clearer. In many cases, therefore, it has been held that acts for the drainage of lands by the power of eminent domain, where the chief object was to improve the land and render it fit for human habitation and cultivation, were constitutional and valid." *Tide-Water Co.* v. *Coster,* 18 N. J. Eq. 518, 90 Am. Dec. 634; *In re Application for Drainage,* 35 N. J. Law, 497; *Hartwell* v. *Armstrong,*

19 Barb. 166; *Talbot* v. *Hudson,* 16 Gray, 417; *Norfleet* v. *Cromwell,* 70 N. C. 634, 16 Am. Rep. 787. In the last case Rodman, J., said: "It is well known that in the Atlantic section of this state there are hundreds of thousands of acres of what is called 'swamp land,' which from the flatness of their surface, and the filling up of the natural courses of drainage, if any ever existed, cannot be relieved of the water which ordinarily covers them, and made fit for human habitation and cultivation, except by cutting artificial canals from them into some convenient creek or river, which must necessarily pass through the intervening lands of the riparian proprietors. If these canals can be cut only by the permission of the owners of the banks of the necessary outlets, this vast area of fertile land must remain for ages an uncultivated and unpopulated wilderness, and it will be entirely valueless to those who bought it from the state on the faith of its laws. An act which aims to remedy so great an evil, affecting so many persons now living, and so many more in the future, must be deemed one of general and public utility. . . . Roads and aqueducts are classed together in the Institutes as servitudes of the same public character. In the swamps, which the act in question chiefly affects, the canals are more important than the roads, as they must always precede them."

In these cases water must be taken off the lands to fit them for habitation and cultivation. In Arizona water must be taken on the lands to fit them for habitation and cultivation. *Lux* v. *Haggin,* 69 Cal. 304, 10 Pac. 674, says: "And while the court will hold the use private when it appears that the government or public cannot have any interest in it, the legislature, in determining the expediency of declaring a public use, may no doubt take into consideration all the advantages to follow from such action; as the advancement of agriculture, the encouragement of mining and the arts, and the general, though indirect, benefits derived by the people at large from the dedication. It may be that, under the physical conditions existing in some portions of the state, irrigation is not theoretically a 'natural want,' in the sense that living creatures cannot live without it. But its importance as a means of producing food from the soil makes it less necessary, in a scarcely appreciable degree, than the use

of water by drinking it. The government would seem to have not only a distant and consequential, but a direct, interest in the use. Therefore a public use.'' Here the use of water for agriculture is held to be a public use. The same authority says: "We are only called on to say that sections of the code which provide for taking water from riparian proprietors (on due compensation to supply farming neighborhoods) are constitutional and valid.'' In *Barbier* v. *Connolly,* 113 U. S. 31, 5 Sup. Ct. Rep. 357, (1884,) Justice Field says: "But neither the amendment, [fourteenth amendment to the constitution,] . . . nor any other amendment, was designed to interfere with the power of the state, sometimes called its 'police power,' to prescribe regulations, to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts, such as for draining marshes and irrigating arid plains.'' "Special burdens are often necessary for general benefit, for supplying water, preventing fires, lighting districts, cleaning streets, opening parks, and many other objects.'' This was said in passing on and construing the constitutional provision, providing that no one shall be "deprived of life, liberty, or property without due process of law.'' "Due process of law'' was held to mean affecting all alike who were of the same class or similarly situated. Take the case of ditching or draining companies in interior states where there are swamp lands. The owners of the swamp lands are allowed to form ditching companies, and drain their lands and the lands of their neighbors, and assess their neighbors *in invitum* for the expenses incurred, and in some instances, as I have before said, selling at a sacrifice, the lands of their neighbors to meet the assessments. The ditches limited in some cases to little farming neighborhoods, comprising fewer in number than thirteen. No doubt these laws were first enacted on the theory of the general health, and may have been continued on that pretense long after everybody understood that the increased productiveness of the soil and the enhanced value of the lands constituted the *primum mobile* of the stock-

holders in the companies. These laws have been upheld in states where the judiciary might say it was a startling proposition to assert that one man might invoke the state's power of eminent domain to convey water over another man's land, paying him ample compensation therefor. In the one case a mere right of way, a slender strip of land, is taken,—is appropriated,—and compensation made therefor; in the other, a ditch or drain is made *in invitum,* and the benefits assessed by others, and must be paid or a forced sale result. Why should the first proposition be startling and the second accepted and approved?

In the state of Nevada it has been held that the law authorizing the condemnation of land to give access to mines, and to enable miners to carry on the business of mining, is constitutional. *Mining Co.* v. *Seawell,* 11 Nev. 402. In *Mining Co.* v. *Corcoran,* 15 Nev. 147, it was held constitutional to authorize the condemnation of lands for the purpose of operating a mine. In Colorado, statutes have been passed authorizing the appropriation of water by individuals for irrigating, and also the right to condemn land for right of way for irrigation. *Canal Co.* v. *Bright,* 8 Colo. 144, 6 Pac. 142; *Schilling* v. *Rominger,* 4 Colo. 100. I refer to these Nevada and Colorado cases as authority direct on the question involved in this case.

An examination of these cases, the mill-site, the mining cases, the water cases, discloses the fact that the legislatures of various states have clothed private corporations and individuals with the power of eminent domain to make available the extraordinary natural resources within their borders. In a great number of these instances there is no participation by the general public, and the public use consists in the purely incidental benefits. The peculiar physical conditions, and the great benefit that would result to the general public, seemed to justify a public policy authorizing the taking of private property to promote the general welfare in such cases. In most states, and under ordinary conditions, laws like the mill-site acts, the dam acts, and the acts allowing land to be condemned to facilitate mining, and for irrigation, would not be passed, and might not be thought of sufficient public necessity and importance to be upheld if passed. The conflict in

the authorities may be accounted for in the different conditions that exist in different states. The authorities are numerous that sites for manufacturing may not be condemned, though manufactories are of great public utility, and promote the general welfare in a pre-eminent degree. But the reason given is that a sufficient number of sites can be had by purchase, and without the necessity of condemnation. But a different 'ruling prevails where manufacturing is done by water-power, and mill-sites are few, as we have seen in the cases before referred to.

All condemnation acts are predicated on the proposition that private ownership must yield to public necessity. "Public necessity" often means, as illustrated in the above instances, public convenience and advantage. We have many other instances of what "public necessity" means. Though telephones are of very recent invention, and reach the very limited few, their use is held to be a public necessity; in other words, public convenience and advantage,—sufficiently so, at least, to justify the exercise of the sovereign power of eminent domain. Natural gas, though limited to localities small in area, is held also to be a public necessity, and therefore to justify the exercise of this extraordinary power. Laws relating to the telephone and natural gas are good illustrations of the adaption of the law to the existing conditions, and the necessity for the enforcement of the doctrine that private property must yield, on compensation being made, to the public welfare. But recently both the telephone and natural gas were unknown, now both are necessary to the public use; that is, we submit to the public convenience and advantage. "Government must adapt itself to the existing condition and wants of society, or its efficiency is destroyed." *Swan* v. *Williams,* 2 Mich. 438. "This right of resumption [condemnation] may be exercised not only when the safety, but also when the interest, or even the expediency, of the state is concerned." *Beekman* v. *Railroad Co.,* 3 Paige, 73, 22 Am. Dec. 679. Property may be taken under power of eminent domain, where the use is merely amusement or recreation, as for public drives or parks. *Higginson* v. *Inhabitants of Nahant,* 11 Allen, 530; *In re Mount Washington Road Co.,* 35 N. H. 134; *In re Bushwick Avenue,* 48 Barb. 9; *County Court* v. *Griswold,* 58

Arizona 3—18

Mo. 175; *Commissioners* v. *Armstrong,* 45 N. Y. 234, 6 Am. Rep. 70.

Speaking of the power of the state to exercise the right of eminent domain in behalf of railroads, Judge Cooley says: "In such cases the property is not so much appropriated to the public use as taken to subserve some general and important public policy." *Ryerson* v. *Brown,* 35 Mich. 339. Chancellor Kent has written: "If the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for that purpose." 2 Kent's Commentaries, 340. I give due weight to the remark of Judge Cooley that "it would not be entirely safe" to apply with "much liberty" the words "in any way"; and the further remark of Judge Cooley that private property may not be taken "for objects which may merely tend to give an aspect of beauty," etc. I have looked into the various instances of the exercise of the right and power of eminent domain in the cases before cited, to ascertain whether it is necessary that the property appropriated should be actually appropriated to a direct public use, or to some use in which the general public might participate, as in the cases of railroads and canals, or whether the requirements of the constitution might not be met, if the use was in pursuance of some general and important public policy. In other words, may a state or territory, in view of its natural advantages and resources and necessities, legislate in such a way, exercising the power of eminent domain, that these advantages and resources may receive the fullest development for the general welfare, the laws being general in their operation? This territory is vast in extent, and rich in undeveloped natural resources. Mountains and deserts are not an inviting prospect, when viewed by a stranger in transit. But the mountains abound in the precious metals, gold and silver, "the jewels of sovereignty"; and the deserts may be made to "bloom and blossom as the rose." The one great want is water. With this resource of nature made available, the mountains and the deserts may be made to yield fabulous

wealth, and Arizona become the home of a vast, prosperous, and happy people. But with water in this territory "cribbed, cornered, and confined" it will continue and remain the mysterious land of arid desert plains, and barren hillsides, and bleak mountain-peaks. The legislature of the territory, seeing what was apparent to all, adopted at an early day a policy,—"a general and important public policy." That policy was to protect against private ownership and monopoly the one thing indispensable to the growth, development, and prosperity of the territory,—the element that would serve to uncover the gold and silver hidden in the hills and mountains, and transform the desert into a garden. Section 22 (Rev. Stats., sec. 2863) of the bill of rights provides "All streams, lakes, and ponds of water capable of being used for the purposes of navigation or irrigation are hereby declared to be public property, and no individual or corporation shall have the right to appropriate them exclusively to their own private use, except under such equitable regulations and restrictions as the legislature shall provide for that purpose." Section 3198 of the Revised Statutes provides: "The common-law doctrine of riparian rights shall not obtain or be of any force or effect in this territory." Then provision is made for public and private *acequias*. Section 3201 of the Revised Statutes of Arizona: "All the inhabitants of this territory, who own or possess arable or irrigable lands, shall have the right to construct public or private *acequias*, and obtain the necessary water for the same from any convenient river, creek, or stream of running water." Section 3202 provides: "Whenever such public or private *acequias* shall necessarily run through the lands of any private individuals not benefited by said *acequias*, the damage resulting to such private individuals on the application of the party interested shall be assessed by the probate judge of the proper county in a summary manner." These provisions were enacted early in the history of the territory, and probably existed as they are now when the territory was a part of old Mexico. The intention was to make the use of water, as much so as practicable within the reach of all, and to guard it against monopoly by private ownership on the one hand, and against being hemmed in by the ownership of the adjacent land

liable to be acquired and held by speculators, on the other hand. The wisdom of this policy, under the physical conditions existing in the territory, must be apparent to every one. What better illustration could we have than the present case? Eight thousand acres of desert land can be brought under cultivation if the right of way can be obtained over intervening land; the value of the land taken is $124.50, which the owner of the land receives. What was the policy? Private ownership and monopoly of the streams, lakes, and ponds was prohibited. They were reserved for and dedicated to the people. To make the water of these streams, lakes, and ponds available, the right of way must be provided for ditches and canals over the lands of those who might become the owners of the soil on the borders of the streams or the margins of the lakes and ponds. Without this provision it is easy to see how a few individuals might throw themselves across the pathway of progress and development by acquiring the lands on the margins of the streams and around the lakes and ponds. The water intended for the free and general use would be surrounded, hemmed in, and without a right of way available under the law the vast tracts of land lying on the outside must forever remain desert, or pay the tribute of extortionate and unconscionable demands. To prevent this, the laws above mentioned were enacted at the very beginning, and before titles were acquired. The laws of the territory, on the subject of water and water-rights, are not peculiar to this territory. Similar laws exist in Nevada, Montana, Colorado, Idaho, Dakota, and New Mexico. The legislatures of all these states and territories have by their enactments declared their belief in the constitutionality of these laws, and in none of them have the courts held otherwise. It is in the first instance for the legislature to declare what are public uses to which private property may be appropriated. If a law declaring such uses, and making provision for such appropriations, is not in contravention of some constitutional provision, it is the duty of the courts to recognize and enforce it. If there is a doubt as to its constitutionality; if not clearly unconstitutional, being the act of the law-making power and a co-ordinate branch of the government,—it is well settled that it is the duty of the courts to

treat and enforce it as a valid law. If the law is unwise in its provisions, or oppressive in its operation, the power that created it must be looked to to repeal or modify it. In this case the proceeding is in the name of the territory of Arizona, by James C. Goodwin as its agent. It conforms to the requirements of the statutes, and is not in contravention of the constitution of the United States, or the organic act of the territory, or any act of Congress. The judgment below is therefore affirmed.

Sloan, J., and Kibbey, J., concur.